**FLORAL TRADE COUNCIL OF DAVIS, CALIFORNIA, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Asociacion Colombiana De Exportadores De Flores, et al., Defendants–Intervenors.**

**Consol. Court No. 90–06–00290.**

United States Court of International Trade.

Sept. 27, 1991.

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Jimmie V. Reyna, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson, (Andrea Fekkes Dynes, Office of Chief Counsel for Intern. Trade Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel), for defendant.

Arnold & Porter, Lawrence A. Schneider, Michael T. Shor and Susan G. Lee, Akin, Gump, Strauss, Hauer & Feld, Patrick F.J. Macrory, Spencer S. Griffith, Washington, D.C., for defendants-intervenors.

OPINION

RESTANI, Judge:

In this case, domestic and foreign producers of fresh cut flowers challenge the final results of the second antidumping duty review by the International Trade Administration ("ITA") in *Certain Fresh Cut Flowers From Colombia,* 55 Fed.Reg. 20491 (1990).[1] The review covered 218 producers and exporters of flowers (standard carnations, miniature (spray) carnations, standard chrysanthemums, and pompon chrysanthemums) from Colombia to the United States, and the period March 1, 1988 through February 28, 1989.

The case is before the court on motions for judgment upon the agency record brought by plaintiff, Floral Trade Council of Davis, California ("FTC"), and the intervenors, Asociacion Colombiana de Exportadores de Flores, its individual members, and 201 individual growers and exporters ("Asocolflores"). The government seeks a remand to correct four specific errors.

The court will address plaintiff's claims first, then turn to claims raised by the intervenors and the government.

STANDARD OF REVIEW

ITA's decision will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).[2] In addition, ITA's interpretation of the statute it administers must be reasonable and must not conflict with Congressional intent. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Four "H" Corp. v. United States,* 9 CIT 271, 272, 611 F.Supp. 981, 983 (1985).

DISCUSSION

I. FTC CHALLENGES

A. *Constructed Value as Basis for Foreign Market Value.*

FTC argues that ITA erred in using constructed value ("CV") as the basis for foreign market value ("FMV") because the

1. Under United States antidumping law, the International Trade Administration issues antidumping duty orders on imported merchandise that is sold, or likely to be sold, in the United States at less than fair value. Merchandise is sold at less than fair value when, in general terms, the United States price is lower than the price at which merchandise is sold in the home market.

2. Unless otherwise stated, citations to the United States Code are to the 1988 edition, and citations to the Code of Federal Regulations are to the 1991 volume.

statute, regulations and agency practice express a preference for third country prices. According to FTC, adequate third country price information was available, and ITA's decision to reject it was unsupported by the record.

1. Statutory Scheme.

■ In the preliminary determination, ITA used home market or third country prices as the basis of FMV, and CV when home market or third country prices were not available. *Certain Fresh Cut Flowers from Colombia Preliminary Results of Antidumping Duty Administrative Review*, 55 Fed.Reg. 456, 457 (1990). In the final determination, ITA rejected home market and third country sales in favor of CV. ITA's decision was based on findings that home market sales were inadequate, and due to an "unusual set of facts" third country prices would not provide an accurate measure of dumping. 55 Fed.Reg. at 20492–493.

Section 773 of the Tariff Act of 1930, as amended, sets forth three methods for determining FMV: home market sales; third country sales; and constructed value. *See* 19 U.S.C. § 1677b(a)(1)—(2).[3] The statute provides that if home market sales are inadequate, FMV may be determined based on CV, notwithstanding third country sales. 19 U.S.C. § 1677b(a)(2).[4] Although the statute places third country prices and CV on a nearly equal footing, the regulations express a clear preference for third country prices. *See* 19 C.F.R. § 353.48(b)[5] ("[t]he Secretary *normally* will prefer foreign market value based on sales to a third country rather than on constructed value") (emphasis added). Nonetheless, ITA interpreted the statute and regulation as giving it discretion to disregard third country sales in favor of CV under "extraordinary circumstances." 55 Fed.Reg. at 20492.

ITA's interpretation was reasonable: third country prices may be abandoned if there is an adequate factual basis in the record for doing so. The statute and regulations cited above, and pertinent case law

**3.** The statute provides, in part:
**(1) In general.**
The foreign market value of imported merchandise shall be the price....
(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption, or
(B) if not so sold or offered for sale for home consumption, or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States....
**(2) Use of constructed value.**
If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, *notwithstanding paragraph (1)(B), the foreign market value of that merchandise may be the constructed value of that merchandise* ...
19 U.S.C. § 1677b(a)(1)–(2) (emphasis added). Constructed value is defined, in part, as:
the sum of—(A) the cost of materials ... and of fabrication or other processing of any kind employed in producing such or similar merchandise ... (B) an amount for general

expenses and profit ... and (C) the cost of all containers and coverings ..., and all other expenses incidental to placing the merchandise under consideration in condition packed ready for shipment to the United States.
19 U.S.C. § 1677b(e)(1).

**4.** *See supra* n. 3.

**5.** 19 C.F.R. § 353.48 provides, in part:
**§ 353.48 Calculation of foreign market value if sales in the home market country are inadequate.**
(a) *In general....* [I]f the quantity of such or similar merchandise sold during the period being examined for consumption in the home market country is so small in relation to the quantity sold for exportation to third countries (normally, less than five percent of the amount sold to third countries) that it is an inadequate basis for the foreign market value of the merchandise, the Secretary will calculate the foreign market value of the merchandise under either § 353.49 [third country sales] or § 353.50 [constructed value].
(b) *Preference for third country sales.* The Secretary normally will prefer foreign market value based on sales to a third country rather than on constructed value if adequate information is available and can be verified, if a verification is conducted, within the time required.
19 C.F.R. § 353.48.

all support this conclusion. *See Smith–Corona Group v. United States,* 713 F.2d 1568, 1576 n. 20 (Fed.Cir.1983) (CV may be used without regard to availability of third country prices); *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT ——, 704 F.Supp. 1114, 1124 (1989) (*"Asocolflores"*) (though statute favors actual prices, ITA not required to find third country prices completely unusable before turning to CV). The next issue is whether substantial evidence in the record supports ITA's decision to reject third country prices.

### 2. Substantial Evidence.

■ ITA gave three reasons for rejecting third country sales: (i) United States and European price and volume movements were not "positively correlated"; (ii) third country sales occurred only in peak months, making it difficult to find contemporaneous sales; and (iii) the perishability of fresh cut flowers leads to price differences that are unrelated to dumping. 55 Fed.Reg. at 20492–493. Because of these factors, ITA concluded third country prices would not provide an accurate measure of dumping. 55 Fed.Reg. at 20943.

#### (i) Lack of correlation between United States and European Markets.

ITA identified several distinctions between United States and European markets which lead to price differences that can "either mask dumping in some instances or exaggerate" it in others. 55 Fed.Reg. at 20492. According to ITA, the United States market is characterized by "extreme price volatility" and pronounced peaks and lulls; in contrast, the European market is mature and demand is consistent throughout the year. *Id.* Europe supplies most of its own flowers, and during peak production periods Colombian flowers cannot be sold there easily. European prices are primarily determined by the auction houses. Because producers must guarantee a certain volume to sell there, Colombian producers are usually prevented from participating. Finally, ITA noted that United States and European holidays often do not coincide, resulting in different peak periods.[6] 55 Fed.Reg. at 20492–20493. Although ITA used an extended one year period of investigation because of the cyclical nature of the flower market, it found that European and United States cycles did not coincide.

Given the presence of different price and demand patterns in United States and European markets, ITA correctly concluded that price differences might be the result of factors other than price discrimination. In light of market differences, reliance on third country prices likely would have produced misleading results. ITA's reasoning on this point was sound. In addition, its findings were supported by substantial evidence. Although citations to the record were not given, it appears that ITA relied heavily on three economic reports submitted by Asocolflores.[7] These reports provide ample support for ITA's findings.

6. The ITA's findings are set forth below:

In general, the United States market is marked by extreme price volatility due to the sporadic gift-giving nature of U.S. demand and by very pronounced peaks during holidays and equally pronounced lulls during the off season. In Europe, there is a mature market for fresh cut flowers throughout the year that is not subject to the extreme volatility that marks the U.S. market. Europe supplies most of its own flowers, and at periods of peak European production, Colombian flowers cannot easily be sold there. European flower prices are primarily determined by auction houses, such as the Aalsmeer auction in Holland. Auction participants must guarantee the auction houses a certain amount of production each year in order to sell there. The Colombian flower growers cannot assure adequate flower production of the type and color demanded in European markets on a yearly basis and are prevented from participating in the Aalsmeer auction. In addition, European holidays often do not coincide with those [in] ... the United States, resulting in different peak periods in the two markets. Even when holidays do coincide, the limited access of the Colombian growers to the European market does not assure them of obtaining peak prices.

55 Fed.Reg. at 20492–493.

7. The reports were: Dr. German Botero, *Fresh Cut Flowers–Some Issues on the Estimation of Dumping Margins in the U.S. Market* ("Botero"); Sparks Commodities, Inc., *Methodological Issues Concerning the Department of Commerce Review of Dumping Margins for Colombian Cut*

### (ii) Third Country Sales Not Made over Entire Year.

ITA also found that third country sales were made only in peak months, not over the entire year, making a fair comparison with United States sales difficult. 55 Fed. Reg. at 20493. ITA reasonably relied on this factor because a comparison of peak foreign and nonpeak United States prices likely would lead to inaccurate results, that is, unreasonably high margins. ITA's finding was supported by questionnaire responses, which indicated that most companies did not have sales to the European market in all months.

### (iii) Perishability Factor.

On the supply side, ITA found that flowers are highly perishable, and subject to natural and economic forces unlike those facing nonperishable products. ITA noted that these difficulties are compounded because Colombian producers plan production for the United States market: in the event of excess production, producers might have to sell in unanticipated markets where they are vulnerable to market differences. Here again, ITA's consideration of this factor was reasonable, and its findings concerning product characteristics and Colombian export patterns are supported by substantial evidence in the record.

At oral argument, FTC asserted ITA should have adopted a "company-specific" approach, and used third country price data, for the companies and during the months such data was available, and constructed value in other cases, as it did in some instances during the investigative phase. FTC, however, failed to provide the court with specific data to indicate for which companies and time periods third country price information was available, and should have been used. In any event, even if FTC had supplied this information,

utilization of third country prices would not account for different demand and pricing patterns in the United States and Europe.

### B. Calculation of Average Constructed Value for Companies that Did not Submit Cost Data.

▮ FTC argues ITA erred in using average CV for companies that did not submit adequate cost data.[8] ITA reviewed information for fifty producers. It did not request cost data, but thirty-nine producers voluntarily submitted cost as well as price information. Eleven producers did not provide complete cost information. Relying on best information available, ITA assigned each firm a weighted-average CV. 55 Fed. Reg. at 20493. ITA must use "best information available" whenever a party *"refuses or is unable to produce information requested* in a timely manner and in the form required." 19 U.S.C. § 1677e(c) (emphasis added); *see also* 19 C.F.R. § 353.-37(a). Normally, however, ITA may not resort to the best information rule without finding "noncompliance with an information request." *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1574 (Fed. Cir.1990). The government concedes that ITA did not request cost data initially, but notes that the decision to abandon third country prices was made late in the proceeding, and cost information was unavailable at that time. While this explains ITA's decision, the government does not offer authority that would justify use of best information in this case in the absence of an information request. Perhaps, in some situations, ITA may rely on averages to fill in incidental data rather than commencing an entirely new investigation. Here, ITA changed its basic methodology. It should have conducted a proper investigation based on its choice of a new methodology. ITA cannot simply average data from producers who volunteer unsolicited

Flowers ("Sparks"); and Dr. Robert E. Litan and ICF Consulting Associates, *U.S. and European Prices of Colombian Cut Flowers: A Statistical Analysis* ("Litan"). FTC argues that two of the reports (Litan and Botero) were untimely and inadequately documented. These arguments are addressed *infra.*

8. FTC also argues that ITA erred in using cost data for the three companies whose price information had been verified. This argument is meritless. When ITA determined that third country prices were inappropriate, price information, whether verified or not, became irrelevant.

cost information. Such a procedure is highly suspect. Remand on this issue is necessary to permit collection of cost data from the eleven companies discussed.

### C. *Reliance on Economic Reports.*

FTC claims that ITA's decision to rely on CV was premised on two economic reports that were untimely and inadequately documented.

■ After the preliminary determination, respondents filed two economic reports, the Litan and Botero reports.[9] ITA found the reports "critical to a reasoned decision on the question of the appropriate basis for foreign market value," and retained them on the grounds that "the Department may request new information at anytime under 19 C.F.R. § 353.31(b)(1)." 55 Fed.Reg. at 20495.

ITA may reject factual information submitted after the preliminary determination. *See* 19 C.F.R. § 353.31(a)(1)(ii); § 353.-31(a)(3); § 353.31(b)(2). The regulations also provide that ITA may request additional information at *any time* during a proceeding. 19 C.F.R. § 353.31(b)(1).[10] Clearly, the regulations give ITA flexibility to obtain information necessary to its decision; if information it deems "critical" is submitted, albeit without a request, ITA has discretion under the regulations to consider it. Certainly, ITA abuses its discretion if it arbitrarily accepts information which is not truly critical. FTC has not shown such abuse. Moreover, FTC cannot claim prejudice because it was given a special opportunity to submit information in rebuttal, which it did.[11] 55 Fed.Reg. at

20945. In addition, FTC has not demonstrated that it has any truly contradictory data. This entire issue appears to rest on speculation.

■ FTC also claims the studies lacked supporting data. ITA acknowledged that "the reports do not indicate the sources of all of the information they rely upon," but found the reports "sufficiently well documented and explained to warrant serious consideration." 55 Fed.Reg. at 20494. ITA was correct. Certainly, each proposition in the reports is not substantiated; however, the general trends are documented and supported by evidence in the record so that the reports are worthy of consideration.

### II.

### ASOCOLFLORES CHALLENGES

### A. *Monthly Average United States Price.*

Asocolflores argues ITA should have used annual rather than monthly United States prices ("USP"). Specifically, Asocolflores claims the fresh cut flower market is characterized by annual demand, and due to perishability of the product, growers are forced to make below-cost sales in certain months. According to Asocolflores, these below-cost sales are economically necessary, and cannot be characterized as dumping; monthly averaging makes no allowance for these sales, and, in essence, measures "technical dumping." Asocolflores also argues that monthly averaging produces unrepresentative prices, is inconsistent with ITA's findings in this and oth-

---

9. *See supra* n. 8.

10. 19 C.F.R. § 353.31(b)(1) provides:
Notwithstanding paragraph (a) [time limits for submission of information] of this section, the Secretary may request any person to submit factual information at any time during a proceeding.
19 C.F.R. § 351.31(b)(1).

11. Respondents submitted the reports on February 28, 1990. On April 3, 1990, five weeks later, ITA informed the parties that it would retain the reports in the record, and gave FTC thirteen days to respond. A.R.Pub.Rec.Doc. 199. At oral argument, FTC claimed that it did not have

adequate time to respond to the reports; FTC claims it made this objection before ITA. FTC did not, however, provide citations in its brief or at oral argument to indicate that this objection was raised before ITA. Moreover, a review of the pertinent part of the record does not indicate that FTC either requested additional time, or objected to the time limits imposed on it. *See* A.R.Pub.Rec.Doc. 202. Without evidence of such an objection, FTC's argument that it lacked sufficient time to respond warrants no further consideration. Furthermore, this was not a new issue. FTC could have submitted its own economic data earlier in the case.

er cases concerning the flower industry, and is unsupported by the record.

■ ITA has authority to select averages, as long as the averages are "representative of the transactions under investigation." 19 U.S.C. § 1677f–1(b); *see* 19 C.F.R. § 353.59(b)(1).[12] Indeed, this court has stated that ITA must select a methodology to account for industry characteristics so that price data is "representative of reality." *See Floral Trade Council of Davis, California v. United States*, 12 CIT 1163, 1168, 704 F.Supp. 233, 239 (1988) (ITA must adopt averaging or another methodology to account for flower perishability). Absent specific evidence that the averaging method resulted in margins that were unrepresentative, ITA's decision will be upheld. *See id.* at 1170, 704 F.Supp. at 239.

■ In this case, ITA used monthly averaging to account for perishability; it rejected annual averaging based on a finding that annual averaging would mask dumping by allowing high prices in peak months to offset low prices in other months. 55 Fed.Reg. at 20494 (Response to Comment 2). This court agrees that monthly averaging adequately compensates for the perishability factor,[13] but averaging over too long a period likely will obscure dumping. *See Floral Trade Council*, 12 CIT at 1169–1170, 704 F.Supp. at 239–240 (monthly averaged USP upheld against claims that longer period should be used); *see Asocolf-*

*lores*, 13 CIT at ——, 704 F.Supp. at 1116 (monthly averaged USP upheld).

The record in this case reveals the tension found in previous cases involving this product between prejudice to producers if prices are not averaged and potential for masking dumping if prices are averaged over too long a period. Asocolflores wants ITA to adjust for the life cycle of flowers; that is, plants grow even in off-peak sales periods. It states that this may be viewed as another perishability factor. As indicated, selecting an averaging period is difficult. No period accounts for the legitimate concerns of all parties. Monthly averaging is one acceptable compromise. ITA averaged over what it considered the shortest period possible to ensure that dumping was not obscured entirely, and at the same time, to account for as many perishability factors as possible.

■ Asocolflores' argument concerning technical dumping was addressed in a previous case. There, this court determined that the peculiarities of the flower industry do not justify an overall negative determination. *See Asocolflores*, 13 CIT at ——, 704 F.Supp. at 1120. In any event, it is for the International Trade Commission to determine if imports sold at less than fair value ("LTFV") cause injury, or if LTFV sales are merely the result of meeting prevailing domestic industry prices and are not injurious.[14] While ITA is free to adjust its

---

**12.** 19 U.S.C. § 1677f–1(b) provides:

> The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

19 U.S.C. § 1677f–1(b).

> 19 C.F.R. § 353.59(b)(1) provides:
> In calculating United States price or foreign market value, the Secretary may use averaging or generally recognized sampling techniques whenever a significant volume of sales or number of adjustments are involved.

19 C.F.R. § 353.59(b)(1).

**13.** Weekly averaging probably would adjust adequately for most perishability problems. Monthly averaging also tends to even out the impact of holiday sales and post-holiday effects.

**14.** In a final antidumping investigation, the International Trade Commission ("ITC") deter-

mines whether a United States industry is materially injured, or threatened with material injury, by reason of imports or sales of the merchandise under investigation. 19 U.S.C. § 1673(2)(A)(i)–(ii). In making this determination, the ITC considers, among other factors, the effect of imports on domestic prices, *see* 19 U.S.C. § 1677(7)(B)(i)(II), and whether there has been significant price underselling, or imports have depressed or suppressed prices to a significant degree. 19 U.S.C. § 1677(7)(C)(ii)(I)–(II). To determine whether price underselling has occurred, ITC considers whether the prices of imported goods are below the level necessary to meet competition. *See e.g., British Steel Corp. v. United States*, 8 CIT 86, 96, 593 F.Supp. 405, 412–13 (1984) (record indicates prices below level required to meet competition); S.Rep.No. 93–1298, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7316 (when products sell at

methodology to measure dumping margins as precisely as possible, it cannot abandon statutory and regulatory procedures because it believes foreign producers' actions are dictated by the domestic market.

■ Asocolflores also argues that the combination of monthly averages for USP and CV for FMV has the ultimate result of guaranteeing affirmative dumping margins for any month in which producers do not make an eight percent profit.[15] This may be the effect of ITA's choices concerning USP and FMV, but it is the effect of the application of the statute and regulations at various stages. Why producers should be protected if their annual profit is eight percent, as would seem to be the result of Asocolflores' proposed method, has not been explained.

Use of CV and necessary averaging may yield unsought results. Congress authorized the use of CV and averaging not because they are desirable methods, but because certain situations necessitate their use. While foreign producers may have received a higher than theoretically desirable rate partially based on the economic necessity of below-cost sales in certain months, it seems equally likely that the rate is somewhat lower than theoretically desirable because of the use of constructed FMV, rather than actual prices. As with the use of best information available, the collateral effects of these methodologies are not always desired. Use of actual prices and sale-by-sale USP data is the ideal situation. These choices are not suitable for this industry, and Asocolflores does not argue for their use.

The court views ITA's overall methodology as acceptable, both in terms of literal adherence to the law and in terms of equity and fairness. None of the parties have offered a better approach and the court has not thought of one. While there is no guarantee that the results are exactly what they should be, they seem to be as fair as possible given the difficulties presented by the perishable commodity at issue.

### B. *Calculation of Sample Group Rate and All Other Rate.*

Asocolflores raises several arguments with respect to calculation of the "sample group" and "all other" rates. The government contends these arguments were not raised before ITA. As an initial matter, therefore, the court must determine which arguments were presented to ITA because, absent exceptional circumstances, an administrative determination will not be set aside upon a ground not presented to the agency. *See Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir. 1990).

ITA has authority to use "representative" samples. 19 U.S.C. § 1677f–1(b). This review covered 218 firms. Thirty-five firms requested a review of themselves ("self-requesting firms"), and petitioner requested a review of the remaining 183 firms. Thirty-three of the 183 firms had no exports, leaving 150 firms ("sample universe") subject to review. From the 150 firms, ITA selected fifteen firms at random, eleven small and four medium or large, and calculated margins for each group. Then, the margins of the two groups were weight-averaged using the export shares of each group to arrive at the overall weighted average margin, or the "sample group" rate. This sample group rate, 4.16 percent, was applied to 135 firms in the sample universe; the fifteen sampled firms received their own individual rates.

ITA applied an "all other" rate of 2.42 percent to the thirty-three firms that had no exports during the review period. This "all other" rate represents the simple average of the weighted-average rates for the (1) sample group; and (2) self-requesting group. 55 Fed.Reg. at 20493.

Asocolflores raises three arguments. First, Asocolflores claims ITA gave undue weight to margins for small firms because in calculating the sample rate, ITA weight-averaged margins for the sampled compa-

---

prices not lower than prevailing United States prices, dumping likely to be technical and not injurious to domestic market).

**15.** Eight percent is the minimum CV profit factor. 19 U.S.C. § 1677b(e)(1)(B)(ii).

nies by the total volume of exports of all companies within the sample universe, rather than only the sampled companies. Asocolflores contends it raised this issue before ITA; however, it does not appear from the document to which Asocolflores refers the court that the argument made here was also made at the administrative level. *See* 1 Pub.Rec. 169. At best, the document is ambiguous as to the argument raised, and cannot be said to put ITA on notice as to the problem.

 Asocolflores' second argument, concerning exclusion of the self-requesting companies, was clearly raised before ITA. 3 Pub.Rec. 182 at 70. At oral argument, Asocolflores conceded that it did not raise its third argument concerning calculation of the "all other" rate, but claims it had no opportunity to do so. This is incorrect since the summary calculation work sheets prepared for the preliminary results clearly indicate that the "all other" rate was based on a simple average. Supp.Pub./Prop.Doc. 75. As a result, the court will not consider Asocolflores' argument concerning the "all other" rate. Out of an abundance of caution, the first ambiguously-raised argument will be addressed, as well as the second argument, which was clearly raised.

 Asocolflores' first argument is that the sample group rate is skewed unfairly towards margins determined for small firms, which had higher margins than the medium and large firms. Small firms accounted for approximately forty-six percent of exports for the sample universe; medium and large firms accounted for fifty-four percent. In arriving at the margin for each group, ITA weight-averaged each group's margin by the percentage representing its share of exports for the sample universe. Asocolflores argues that ITA should have weight-averaged each groups' margin based on a percentage rep-

resenting its share of the *sampled* companies' exports.[16] As the government correctly points out, the purpose of the sample was to obtain a representative rate for all firms in the sample universe; therefore, the only relevant percentage was each group's relation to the sample universe.

 Asocolflores' second argument—that the sample group rate is not representative because ITA did not include the self-requesting firms in its calculations—fails for a similar reason. The purpose of sampling was to determine a rate only for the 150 firms in the sample universe; the self-requesting companies were not part of the sample universe.

### C. *Double–Counting Credit Expense in Constructed Value.*

 Asocolflores claims, and the government concedes, that when it calculated CV ITA double-counted credit expense. In calculating FMV, ITA makes adjustments for differences in the circumstances of sale between United States and foreign markets; an adjustment is made for differences in credit terms. *See* 19 U.S.C. § 1677b(a)(4)(B); 19 C.F.R. §§ 353.-56(a)(1)–(2). In this case, it appears that ITA made an adjustment for credit expense; that is, the cost of financing accounts receivable or extending credit to United States customers.[17]

Interest expense, or the cost to the company of financing its debt, is one of the components of CV. *See* 19 U.S.C. § 1677b(e)(1)(B) (CV includes amount for general expenses); 19 C.F.R. § 353.50(a)(2) (same); *East Chilliwack Fruit Growers Coop. v. United States*, 11 CIT 104, 107, 655 F.Supp. 499, 503 (1987) (general expenses include cost of financing). ITA assumes that part of the debt is credit expense—the amount used to finance accounts receivable. Because credit expense

---

**16.** Here, the percentages differed. Small firms accounted for only fourteen percent of exports for the eleven sampled companies exports; the medium and large companies accounted for eighty-six percent.

**17.** According to Asocolflores, the credit-expense adjustment was made as follows: in cases

where USP was based on Exporter's Sales Price, ITA deducted credit expense from USP; in cases where USP was based on Purchase Price, ITA added credit expense to FMV. Asocolflores does not provide citations to the record. Exporter's Sales Price and Purchase Price are defined in 19 U.S.C. §§ 1677a(b)–(c).

has already been accounted for through the circumstance-of-sale adjustment, in calculating CV, ITA routinely deducts from interest expense an amount that represents credit expense. *See Roller Chain, Other than Bicycle, From Japan*, 55 Fed.Reg. 42602, 42604 (1990) (in CV calculation interest expense reduced by amount related to accounts receivable to allow for credit costs already added to CV); *Mechanical Transfer Presses from Japan*, 55 Fed.Reg. 335, 337 (1990) (same); *64K Dynamic Random Access Memory Components (64K DRAM's) From Japan*, 51 Fed.Reg. 15943, 15949 (1986) (Response to NEC Comment 4) (same). Without such an adjustment, credit expenses would be double-counted in CV. *See 64K DRAMs*, 55 Fed.Reg. at 15949.

ITA failed to make the necessary adjustment for credit expense. This error affects five companies: Floral/Bochica, Flores de Serrezuela, La Valvanera, Florandia, and Jardines del Muna. On remand, ITA shall make the necessary adjustments.

### D. Street Vendor Sales.

■■■ Asocolflores' next argument is that ITA improperly included sales to street vendors in the United States in USP calculations for Floral/Bochica and Inversiones Targa. ITA characterized these sales as "distress" sales, and refused to exclude them, finding that distress sales consist of the same class or kind of merchandise as export quality flowers. 55 Fed.Reg. at 20500 (Response to Comment 66).

As the government correctly points out, if merchandise enters the United States as "export quality," it is included in the calculation of USP because it is within the scope of the investigation: the fact that the merchandise subsequently deteriorates and is sold on the street at a lower price is irrelevant. Averaging already accounts for perishability, and all United States sales both in and out of the ordinary course of trade are included in calculating USP.[18] Here, Asocolflores does not point to any evidence in the record to indicate that flowers sold by street vendors were of inferior quality when they entered the United States. In the absence of such evidence, street vendor sales were properly included.

To be consistent, street vendor sales also should have been included in the calculation of inland freight in Colombia. The denominator used to calculate inland freight was sales volume, excluding street vendor sales. Because street vendor sales were included in USP data, they should also have been included in calculating the inland freight charge. This issue affects Floral/Bochica. ITA will make the necessary adjustment on remand.

### E. Exclusion of Certain Revenue Accruing to Dianticola Colombiana.

■■■ Both Asocolflores and the government seek a remand to permit ITA to adjust for revenues deposited by Dianticola's consignment agent into a United States bank. The record indicates that Dianticola sells its flowers on consignment to an agent in Miami, who deposits [ * ] percent of gross sales revenue into a United States bank account. *See* 4 Prop.Rec. at 226–239A. Dianticola included this amount in its "total revenue" for calculation of USP, *id.*, but ITA recalculated USP without regard to this income, finding no proof that revenues were related to sales under consideration. 55 Fed.Reg. at 20498 (Response to Comment 36). Failure to include these revenues in the USP calculation decreased Dianticola's USP, thereby increasing its dumping margin. In fact, Dianticola's questionnaire response indicated that the income represented a percentage of sales revenues from flower sales. *See* 4 Prop.Rec. at 226–239A. ITA should have

---

18. In *Ipsco, Inc. v. United States*, 12 CIT 384, 687 F.Supp. 633 (1988), this court noted that the statutes and regulations concerning FMV provide for consideration only of sales in the "ordinary course of trade," whereas no corresponding provisions exist for USP. 12 CIT at 393–94, 687 F.Supp. at 640–41; *Compare* 19 U.S.C. § 1677b(a)(1); 19 C.F.R. § 353.46(a)(1), § 353.46(b) *with* 19 U.S.C. § 1677a and 19 C.F.R. § 353.41. Hence, United States sales both in and out of the ordinary course of trade are included in the USP calculation.

* Confidential information deleted.

included these revenues in calculating Dianticola's USP; in the alternative, if ITA was unsatisfied with the questionnaire response, in fairness, a deficiency letter should have been issued. On remand, the necessary adjustments shall be made.

### F. Calculation of Constructed Value for Flores El Trentino.

Both Asocolflores and the government seek a remand to correct a clerical error concerning calculation of CV for Flores El Trentino. The record indicates that the correct CV for Flores El Trentino was [ * ] pesos per carnation. 6 Prop.Rec. at 2121A. In calculating the dumping margin, ITA used another figure, 25.5248 pesos. *See* 7 Prop.Rec. at 1315A. This error is to be corrected on remand.

### G. Offsets to Financial Expenses.

■ Asocolflores claims ITA erred in failing to offset financial expenses of Floral Ltda./Exportaciones Bochica ("Floral"), and La Valvanera ("Valvanera") by exchange rate gains and interest income.

Constructed value includes the cost of producing the particular merchandise under consideration and an amount for general expenses. *See* 19 U.S.C. § 1677b(e)(1)(A)–(B); 19 C.F.R. § 353.-50(a)(1)–(2). In calculating CV in at least one previous case, ITA has adjusted general expenses to account for exchange rate gains and losses. *Offshore Platform Jackets and Piles from the Republic of Korea,* 51 Fed.Reg. 11795, 11796 (1986). In addition, ITA has allowed interest expenses to be offset by interest income if that income is earned from short-term investments related to current operations of the company. *Certain Small Business Telephone Systems and Subassemblies Thereof From Taiwan,* 54 Fed.Reg. 42543, 42545 (1989); *see Cellular Mobile Telephones and Subassemblies From Japan,* 54 Fed.Reg. 48011, 48016 (1989) (Response to Comment 16).

In its questionnaire response, Floral deducts "exchange rate gains and other debt-related income" from interest expense. 5 Prop.Rec. 399A, Annex D–8. Valvanera includes "exchange rate gains and losses" in the general expense component of CV. 5 Prop.Rec. 1630A. The Department's questionnaire specifically requests itemization of all offsets to expenses, and an explanation as to the manner in which offsets relate to production of the subject merchandise. *See* 1 Pub.Rec. 575.[19] Neither Floral nor Valvanera provided a proper itemization, nor did they explain how offsets were related to flower production. *See* 5 Prop.Rec. 399A (Floral); 5 Prop.Rec. 1630A, 1712A (Valvanera). It appears that ITA denied the offsets on this basis. 55 Fed.Reg. at 20501 (Response to Comment 71) (Valvanera); *see* 7 Prop.Rec. 851A (Floral). As the companies failed to comply with clear instructions in the questionnaires, ITA's decision was proper.

■ Asocolflores protests that ITA should have issued a deficiency letter. Certainly, if the companies made a good faith attempt to respond to ITA's questionnaire and substantially complied with the request, ITA might have an obligation to issue a deficiency letter. Where, however, a company utterly fails to comply with a clear request, no obligation to issue a deficiency letter arises. In light of the unambiguous request and feeble responses, deficiency letters were not required.

### H. Normalization of Costs.

#### 1. Florandia Herrera–Camacho.

■ Asocolflores claims ITA failed to amortize start-up costs for Florandia Herrera–Camacho's pompon crop, and failed to normalize movement charges associated with United States pompon sales. Florandia Herrera–Camacho began growing pompons in 1988. The first two crops were improperly fertilized; the company experienced low yields of export-quality pompons, and many flowers shipped to the United States were destroyed or returned for cred-

---

**19.** The document indicates service on Floral Ltda. The court assumes that Valvanera was served with the same questionnaire.

it due to their poor condition. Florandia treated costs associated with these low yields as start-up costs, and amortized them over the production cycle. It also amortized costs associated with movement and selling expenses. ITA denied the adjustments, finding "insufficient historical evidence of normal production and sales to support the claim that this was an abnormal situation." 55 Fed.Reg. at 20493.

ITA did not provide a sufficient basis for rejecting the claimed adjustments. Because these were "start-up" costs, no record of past performance existed. Florandia produced data to show comparative costs for the period March 1989 to September 1989, when its production reached normal levels. Upon remand, ITA should reconsider this issue in light of the comparative data provided by Florandia. The government's argument that these types of costs are not "abnormal" is not reflected in ITA's findings, thus the court declines to consider it.

2. Flores La Valvanera and Flores Dos Hectareas.

■ Asocolflores also claims ITA should have adjusted constructed values for Flores La Valvanera and Flores Dos Hectareas to account for abnormally low yields due to natural disasters. In La Valvanera's case, the low yield was caused by an "unexpected and extraordinary (sic) extremely hard viral attack which left the plants with yellow foliage." 3 Pub.Rec. 98–99 at 31–32. In Dos Hectareas' case, the low yield was caused by collapse of an irrigation well. 3 Pub.Rec. 394–403.

ITA refused to adjust CV to account for these natural disasters. ITA found that La Valvanera failed to provide information as to what it considers "unusual" damage, or as to its "normal" or "expected" production

levels. 55 Fed.Reg. at 20501 (Response to Comment 70). Similarly, ITA found that Dos Hectareas failed to provide sufficient or timely information concerning the existence or magnitude of the problem, and its projected or historical production yield. 55 Fed.Reg. at 20496 (Response to Comment 22).

ITA erred in rejecting the claimed adjustments on the grounds of insufficient information. Both companies provided *some* information as to the unusual nature of the events; in addition, it appears that both companies provided information concerning expected production. In the event that ITA believed information provided was inadequate, under these circumstances, it should have given notice of the deficiency, and provided an opportunity to supplement the record. The case is remanded on this point to allow the parties to supplement the record, and for further findings.

### CONCLUSION

This case is remanded for further consideration in accordance with this opinion with respect to the following issues: calculation of constructed value for companies not submitting cost data; credit expense adjustment; inland freight charges and street vendor sales; exclusion of revenues accruing to Dianticola; constructed value for Flores El Trentino; and normalization of costs to account for low yields and natural disasters. In all other respects, ITA's determination is affirmed.