ZENITH ELECTRONICS CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 90-07-00339

(Dated September 21, 1994)

*Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel* and *Joseph A. Perna, V)* for plaintiff Zenith Electronics Corporation.
*Collier, Shannon, Rill & Scott (Paul D. Cullen, Jeffrey S. Beckington, Mary T. Staley, David C. Smith. Jr.* and *Gail S. Usher)* for plaintiff-intervenors Independent Radionic Workers of America, the international Brotherhood of Electrical Workers, the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers (AFL-CIO) and the Industrial Union Department (AFL-CIO).
*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Velta A. Melnbrencis), Priya Alagiri,* Attorney Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.
*Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Sukhan Kim, Warren E. Connelly, P.C.* and *Margaret L.H. Png)* for defendant-intervenors Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

## OPINION

RESTANI, *Judge:* This matter is before the court on three motions pursuant to USCIT Rule 56.2 for judgment upon the agency record. The motions have been brought by (1) the Independent Radionic Workers of America, the International Brotherhood of Electrical Workers, the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers (AFL-CIO) and the Industrial Union Department (AFL-CIO) (collectively "the Unions"), (2) Zenith Electronics Corporation, and (3) Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung"). The court has consolidated these separate challenges to the determination of the International Trade Administration of the United States Department of Commerce ("ITA" or "Commerce") in *Color Television Receivers from the Republic of Korea,* 55 Fed. Reg. 26,225 (Dep't Comm. 1990) (fourth final admin. review).

## STANDARD OF REVIEW

As this consolidated action constitutes a challenge to the final determination of an administrative review, the applicable standard of review is whether the final determination is supported by substantial evidence on the record and is otherwise in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## DISCUSSION

I. *Adjustment for Value-added Taxes:*

To account for home market value-added taxes ("VAT") forgiven by reason of exportation, Commerce added the amount of VAT to United States price ("USP") and made circumstance of sale ("COS") adjust-

ments to foreign market value ("FMV").[1] 55 Fed. Reg. at 26,226. All parties agree that Commerce may not make a COS adjustment for VAT, as decided by the Federal Circuit in *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1581 (Fed. Cir. 1993). This case is remanded for a recalculation of VAT pursuant to Commerce's new methodology, which was upheld in *Torrington Co. v. United States,* 854 F. Supp. 446, 448–49 (Ct. Int'l Trade 1994) and *Independent Radionic Workers v. United States,* Slip Op. 94–144, at 3–4 (Sept. 16, 1994).

II. *Adjustments for Antidumping Duties:*

Zenith contends that antidumping duties actually paid or to be paid should be deducted from USP pursuant to 19 U.S.C. § 1677a(d)(2)(A), (e)(2) (1988).[2] *See also* 19 C.F.R. § 353.26(a) (1990) (providing for deduction of antidumping duties that producer or reseller paid directly on behalf of importer or reimbursed to importer).

In the final determination, Commerce rejected Zenith's claim for a deduction in the amount of *estimated* antidumping duties. 55 Fed. Reg. at 26,227. Zenith now asserts that adjustments should be made for *actual* antidumping duties. The issues are not the same. *See Zenith Elecs. Corp. v. United States,* Slip Op. 94–146, at 5–6 (Sept. 19, 1994); *PQ Corp. v. United States,* 11 CIT 53, 652 F. Supp. 724 (1987). Therefore, Zenith did not exhaust its administrative remedies as to its actual antidumping duty expense claim.[3]

Moreover, Zenith failed to raise the issue of a deduction for actual antidumping duties in its complaint. *See* USCIT Rule 8(a) (requiring pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); Compl. ¶ 4(h) (alleging that ITA erred by failing to account for estimated antidumping duties). Zenith's motion to amend its complaint was denied. *Zenith Elecs. Corp. v. United States,* Consol. Ct. No. 90–07–00339 (Ct. Int'l Trade July 22, 1994) (order denying Zenith's motion to amend complaint). The issue is thus not properly before this court and the court will not address it.

III. *Allocation of Cash Discounts and promotional Discount Allowances:*

Samsung's original questionnaire response used an allocation methodology to determine cash and promotional discounts in the U.S. mar-

---

[1] Commerce did not measure the amount of tax passed through to the home market consumer. 55 Fed. Reg. at 26,226. Samsung no longer contests that Commerce was correct, in light of *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1517 (Fed. Cir. 1993), *cert. denied,* 114 S. Ct. 2672 (1994).

[2] Section 1677a(d)(2)(A) provides that USP shall be reduced by

the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States * * *.

19 U.S.C. § 1677a(d)(2)(A). Section 1677a(e)(2) provides that the exporter's sales price ("ESP"), a type of USP, shall be reduced by the amount of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." *Id.* § 1677a(e)(2).

[3] Zenith argues that waiver of the exhaustion requirement is appropriate because the issue is purely legal and raising it before the agency would have been futile. *See Budd Co. v. United States,* 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991). Zenith made the same arguments in its challenge to the results of the third administrative review. The arguments are rejected for the same reasons stated in the court's disposition of that challenge. *Zenith,* Slip Op. 94–146, at 5 n.4.

ket. Resp. Br. of Def.-Ints. Opp'n to Pl.-Ints.' Mot. J. Agency R., Conf. App. 1, at App. C- 16. This methodology divided the total amount of discounts paid during the review period by the total value of all products sold at exporter's sales price ("ESP"). *Id.*[4] For both cash and promotional discounts, the dealer normally deducts an agreed-upon percentage from the invoice amount. *Id.* Conf. App. 1, at 28–29.

In response to Commerce's supplemental questionnaire, Samsung explained that because of the manner in which the discounts were granted, they could not be reported on a sales-specific or product-specific basis. *Id.* Conf. App. 2, at 22–24. Instead, Samsung provided a listing of discounts by dealer. *Id.* at 23–24. The Unions proposed that Commerce apply best information available ("BIA"), using an allocation methodology that divides total per dealer discounts by the sales of subject merchandise to each dealer. 55 Fed. Reg. at 26,234. In its final determination, Commerce stated,

> There is no information on the record regarding the ratio of total dealer-specific color television sales to total dealer-specific sales of all products. The methodology proposed by [the Unions) clearly would skew the discount amount * * * to the extent that dealers purchased other products. As best information available, we have used the total discounts and divided them by total dealer sales to obtain an appropriate allocation amount.

*Id.*

The statute directs the use of BIA "whenever a party * * * refuses or is unable to produce information requested." 19 U.S.C. § 1677e(c) (1988). Commerce's decisions with regard to BIA are accorded considerable deference. *Allied-Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191 (Fed. Cir. 1993).

ITA may also use data that are least favorable to a non-complying respondent, based on the common sense inference that if more favorable figures existed, respondent would have submitted them. *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190 (Fed. Cir. 1990). This practice "fairly places the burden of production on the importer, which has in its possession the information capable of rebutting the agency's inference." *Id.* at 1190–91; *see also Allied-Signal,* 996 F.2d at 1192 (explaining that ITA's use of least favorable information "avoids rewarding the uncooperative and recalcitrant party" for failure to supply requested data).

Commerce argues that it did not resort to the adverse allocation methodology advocated by the Unions because Samsung reported the information in the best manner it could, given its accounting system. Commerce exercised its discretion in choosing a methodology that, in its opinion, would avoid skewing discount amounts and thus accomplish the purpose of BIA—to determine margins as accurately as possible.

---

[4] ESP means "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter." 19 U.S.C. § 1677a(c) (1988).

*Rhone Poulenc,* 899 F.2d at 1191. Commerce's choice of BIA is not unreasonable or contrary to law.

## IV. *Indirect Versus Direct Selling Expenses:*

### A. Credit Sale Rebates

As it did during previous review periods, Samsung granted installment sales incentive rebates at a fixed annual percentage rate. Resp. Br. of Def.-Ints. Opp'n to Pl.-Ints.' Mot. J. Agency R., Conf. App. 1, at App. B–5. These rebates were available to home market distributors who sold to consumers on credit pursuant to the Shin Yong Pan Mae ("SYPM") rebate program. To calculate a per unit amount of the rebate, Samsung divided the total amount of rebates paid on the subject merchandise by the total amount of sales revenue for the subject merchandise. *Id.* Samsung then multiplied the resulting percentage by the price of each individual home market sale under investigation.

In its comments to the preliminary results, Samsung interpreted its rebate data as showing no consistent pattern of a greater rate on larger or smaller models. Pl.-Ints.' Br. Supp. Not. J. Agency R., App. 2, at 10. In Samsung's view, a single overall rate would provide the most accurate allocation methodology. *Id.* Nonetheless, it submitted model-specific data for Commerce's use. *Id.* App. 2, at 9. The final determination treated the rebates as direct selling expenses, without resorting to the model-specific data. 55 Fed. Reg. at 26,232. It stated,

> Samsung cannot identify which particular sets qualified for the rebate * * *. However, * * * we verified that Samsung credited its dealers with the claimed rebate amounts, and all models were eligible for the rebate program.

*Id.*

Samsung maintains that it is unable to tie specific rebates to specific sales because the rebate payments were conditioned on sales *by* distributors, not sales *to* distributors. The Unions argue that rebate data must be linked with specific sales or specific models in order to be directly related to sales. Commerce seeks a remand to develop a consistent practice as to installment sales incentive rebates, which were treated as indirect selling expenses in the three prior administrative reviews. *See Zenith,* Slip Op. 94–146, at 13.

In the judicial review of the third final administrative results, this court considered Samsung's allocation methodology to have a sufficiently direct relationship to the sales under investigation. *Id.* at 14–15. The use of model-specific data was not required, because the rebate was calculated at a fixed percentage of sales. *Id.* at 15. The court perceives no benefit in remanding Commerce's treatment of similar expenses in the fourth administrative review, where Commerce classified the expenses as direct. Therefore, this court sustains Commerce's determination in

this respect and denies its request for remand to conform its determination to that in previous reviews.[5]

B. Quantity Discounts or Volume Rebates

Samsung claimed a quantity discount adjustment for amounts paid under its major products promotional ("MPP") discount program.[6] If Samsung's home market distributors achieved certain sales levels over a certain period, Samsung paid the distributors a percentage of the total sales revenue for the period. Def.'s partial Opp'n to Def.-Ints.' Mot. J. Agency R., Conf. App., Ex. 2, at 1907A. The percentage rate increased as the monetary value of total purchases increased. *See id.;* Def.-Ints.' Mem. Supp. Not. J. Agency R., at 7.

In its final determination, ITA categorized the MPP program as one granting a cumulative volume rebate rather than a quantity discount. 55 Fed. Reg. at 26,232. It stated,

> [a]djustments for quantity discounts under § 353.55 of the Commerce regulations are based on the premise that higher volume sales lead to cost savings on each individual sale used to establish FMV. Samsung, in fact, demonstrated that the MPP rebate is based on cumulative sales, many of which were low-volume sales.

*Id.* ITA classified the MPP rebates as direct selling expenses and consequently performed a COS adjustment to FMV. *Id.*[7]

The statute provides for adjustments to FMV, apart from COS adjustments, if a price differential between USP and FMV "is wholly or partly due to" the difference in the commercial quantities in which the merchandise is sold in the United States and the home market. 19 U.S.C. § 1677b(a)(4) (1988). The implementing regulation directs Commerce to consider home market quantity discounts in making its adjustments. 19 C.F.R. § 353.55(a) (1990). ITA will calculate FMV based on discounted sales if (1) the manufacturer granted discounts of at least the same magnitude on 20 percent or more of home market sales during the period of investigation or a more representative period, or (2) the discounts reflect cost savings due to the production of different quantities. *See id.* § 353.55(b) (1990).

Volume rebates, as opposed to quantity discounts, are treated as direct selling expenses if they are directly related to the sales under consideration. *See, e.g., Smith-Corona Group v. United States,* 713 F.2d 1568, 1579–81 (Fed. Cir. 1983), *cert. denied,* 465 U.S. 1022 (1984). A quantity discount is normally offered on a single large quantity sale as an up-front reduction in price. *See Silver Reed America, Inc. v. United*

---

[5] The Unions argue that Samsung's methodology does not create a direct relationship to sales because it allocates across all sales, not all rebated sales, and thus allows a deduction for merchandise that did not experience a rebate. As Samsung's questionnaire response makes clear, dividing the rebate amount by the gross sales amount results in a lower percentage than the fixed rate available under the program. Resp. Br. of Def.-Ints. Opp'n to Pl.-Ints.' Mot. J. Agency R., Conf. App. 1, at App. B–5. Thus, each sale is reduced by less than the full rebated amount to account for unrebated sales. Under this methodology, there is little danger of overestimating the discount allowance.

[6] The program applied to sales of color televisions, video tape recorders and microwave ovens.

[7] This adjustment does not give a producer the across-the-board FMV adjustment allowed by ITA's quantity discount methodology. *See Independent Radionic Workers,* Slip Op. 94–144, at 21.

*States,* 12 CIT 39, 47–48, 679 F. Supp. 12, 19, *clarified, on reh'g,* 12 CIT 250, 683 F. Supp. 1393 (1988). A volume rebate is granted at the end of a period for total sales throughout the period. *See Brother Indus., Ltd. v. United States,* 3 CIT 125, 148–49, 540 F. Supp. 1341, 1363 (1982), *aff'd, Smith-Corona,* 713 F.2d 1568.

Samsung's practice of paying a distributor an after-sale amount representing a certain percentage of total sales is more characteristic of a volume rebate than a quantity discount. Therefore, the fact that these rebates were granted on over 20 percent of Samsung's home market sales for a representative period of time is not determinative. *See* 19 C.F.R. § 353.55(b)(1). The regulations concerning quantity discounts do not apply.

Samsung raises two additional contentions: (1) that the MPP rebates were partly or wholly due to differences in quantities sold and (2) that Commerce erroneously relied on a "cost savings" rationale in reaching its decision. In support of the first argument, Samsung cites to data showing that the average quantity sold in a single U.S. transaction was substantially larger than the average quantity in a single home market sale. Reply Br. of Def.-Ints., Conf. App., Tab 1, at App. 1. Samsung fails to establish a causal link between the rebate amounts and the difference in average quantity sold. Therefore, it does not satisfy the requirements for an adjustment under 19 U.S.C. § 1677b(a)(4).

As for Samsung's second contention, it is clear that Commerce did not rely on the cost savings prong of the regulation in refusing to treat the MPP rebates as quantity discounts. Commerce found primarily that the MPP program granted cumulative volume rebates. 55 Fed. Reg. at 26,232. Commerce's statement that "higher volume sales lead to cost savings on each individual sale," *id.,* merely emphasized that quantity discounts, unlike volume rebates, are based on individual sales. ITA properly treated Samsung's MPP rebates as volume rebates entitled to a direct selling expense adjustment.[8]

C. Bad Debt Expense

During the administrative proceedings, Samsung claimed that bad debt expenses incurred during the period of review are entitled to treatment as direct selling expenses. *Id.* Samsung relied on *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 257, 712 F. Supp. 931, 938 (1989), *aff'd in part and rev'd in part on other grounds,* 6 F.3d 1511 (Fed. Cir. 1993), *cert. denied,* 114 S. Ct. 2672 (1994). ITA declined to follow *Daewoo* on the ground that it did not constitute a final decision and was subject to reversal. 55 Fed. Reg. at 26,232. ITA now requests a remand to reconsider the issue.

In *Daewoo,* ITA asserted that bad debt expenses were indirect unless they were incurred on sales under review and the debt was written off during the period of investigation. 13 CIT at 257, 712 F. Supp. at 938.

---

[8] *Cf. Independent Radionic Workers,* Slip Op. 94–144, at 22–23 (remanding to ITA for treatment of volume rebates as direct selling expenses).

Samsung countered that ITA's treatment of bad debt expenses and warranty expenses was thus inconsistent. *Id.* The court agreed, finding no meaningful distinction

> between warranty expenses, which are supposedly 'always direct,' whether or not they are actually incurred with regard to the sales under review, and bad debt expenses, which are determined to be either 'direct' or 'indirect' depending on whether they are actually incurred with regard to the specific sales under review.

*Id.* at 258, 712 F. Supp. at 939. According to the court, "[a]bsent any reasonable indication as to why the estimation of bad debt expenses based on past experience is any less reliable than the use of past experience for warranty expenses, this distinction between them is not proper." *Id.* at 259, 712 F. Supp. at 940.

*Daewoo* does not completely foreclose ITA from treating bad debt expenses as indirect. Nonetheless, ITA had the benefit of *Daewoo* and it neither articulated factors which would distinguish its treatment of bad debt from its treatment of expenses such as warranty, technical services and advertising, nor collected information which would be relevant to such a distinction. The court deems it unwise to reopen this issue to allow ITA to venture down this avenue at this late date in these proceedings. Accordingly, ITA is instructed to treat Samsung's bad debt expenses as a direct selling expense, unless data is lacking or proper allocation is not possible.

D. Home Market Warranty Expenses

Samsung requested ITA to classify as direct all home market warranty expenses, both fixed and variable. 55 Fed. Reg. at 26,232. As support, Samsung cited *AOC Int'l, Inc. v. United States,* 13 CIT 716, 721 F. Supp. 314 (1989). 55 Fed. Reg. at 26,232. ITA denied Samsung's request on the ground that "Samsung never demonstrated that the expenses were directly related to sales." *Id.* ITA referred to its denial of similar claims by other respondents for the reason that the respondents had not demonstrated the factual similarity between their circumstances and *AOC. Id.* at 26,230.

In *AOC,* Commerce denied a direct selling expense adjustment for the labor component of in-house warranty expenses on the ground that these expenses were fixed rather than variable. 13 CIT at 717, 721 F. Supp. at 316. This court rejected "ITA's rationale that the in-house labor costs * * * are fixed overhead costs which a company incurs irrespective of the terms of the sales under consideration." *Id.* at 718, 721 F. Supp. at 316. The court explained,

> [i]t would be contrary to common sense to maintain a warranty servicing department and to pay salaries to the in-house servicemen, if no warranty terms were offered on the CTV sales. Similarly, a much smaller servicing department would be necessary to service warranties with more limited terms.

*Id.,* 721 F. Supp. at 316–17.

The court refused to imply a requirement that each component of warranty costs must independently qualify as a direct selling expense. *Id.* at 719, 721 F. Supp. at 317. It also did not hold "that the eligibility of warranty expenses as directly-related selling expenses *per se* qualifies the labor cost component of the warranty expenses as directly-related selling expense." *Id.*, 721 F. Supp. at 318. Taking the middle path, the court deemed it illogical "to grant an adjustment for the difference in warranty expenses, while disallowing a major cost component of this directly-related selling expense." *Id.*, 721 F. Supp. at 317. *AOC* thus leaves Commerce some discretion in determining whether certain components of the claimed home market warranty costs (other than labor) qualify as direct selling expenses.

In addition, ITA does not distinguish this situation from the second review period, where ITA treated Samsung's variable warranty expenses as direct. *See Independent Radionic Workers*, Slip Op. 94–144, at 26. This issue is thus remanded for ITA to modify its decision in light of *AOC* and to provide a reasoned explanation if it intends to deny direct selling expense treatment to particular claimed warranty cost components.

## VI. *Untimeliness of Samsung's Home Market Inventory Carrying Costs Information:*

Samsung argued that ITA should impute inventory carrying costs in the home market as well as in the United States. 55 Fed. Reg. at 26,234. ITA responded that Samsung did not produce data that would allow ITA to do so. *Id.* It agreed with Samsung that carrying costs should be imputed in both markets, but maintained that Samsung did not submit timely information allowing ITA to calculate the number of days between shipment and sale in the home market. *Id.* at 26,229.[9]

Samsung argues that ITA did not request information as to pre-sale inventory carrying costs in either the original or supplemental questionnaire. Moreover, the issue was not treated in the preliminary results published on December 5, 1989. *Color Television Receivers from Korea*, 54 Fed. Reg. 50,258 (Dep't Comm. 1989) (prelim. admin. results). The first mention of it appeared in a December 21, 1989 letter from Commerce informing parties of recognized errors in computer calculations.[10] Def.-Ints.' Mem. Supp. Mot. J. Agency R., Conf. App. C, Tab 7. The letter states only that "[t]he calculation of imputed inventory financing in both FMV and U.S. price calculations was omitted in all four programs." *Id.* In its January 12, 1990 reply brief, Samsung informed ITA that the expense should be based upon the period from the date of shipment from the factory to the date of sale. *Id.* Tab 6, at 9 & n.3.

---

[9] Carrying costs are computed according to the number of days the manufacturer does not receive a return on its merchandise.

[10] ITA apparently changed its methodology for imputing inventory carrying costs between the date of the original questionnaire and the preliminary results. *See Torrington Co. v. United States*, 818 F. Supp. 1563, 1575 (Ct. Int'l Trade 1993).

ITA requests a remand to reconsider its determination. Zenith and the Unions argue that the regulations prohibit any resort to factual information submitted after the publication of the preliminary results, regardless of the reasons. The regulations in effect at the time of the final determination direct parties to submit any factual information at least by the time of the preliminary determination. 19 C.F.R. § 353.31(a)(1)(ii) (1990). They provide that "in no event will the Secretary consider unsolicited questionnaire responses submitted after the date of publication of the Secretary's preliminary determination." 19 C.F.R. § 353.31(b)(2) (1990).[11]

Despite the language of the regulations, this court has found that ITA retains the flexibility to accept the submission of information after expiration of applicable time limits. *See Floral Trade Council v. United States,* 15 CIT 497, 502, 775 F. Supp. 1492, 1499 (Ct. Int'l Trade 1991). If ITA receives important factual information after the publication of the preliminary results, ITA has some discretion to consider it. *Id.; see also Böwe-Passat v. United States,* Slip Op. 93–68, at 7 (May 7, 1993).

In determining whether or not ITA should now be permitted to accept the submissions, the court should consider whether the party has been given a reasonable opportunity to satisfy ITA's evidentiary concerns. *Böwe-Passat,* Slip Op. 93–68, at 7–8. Because ITA did not ask for the specific imputed inventory carrying costs information it asserts is needed, before the publication of the preliminary results, ITA's request for remand is granted.

## VII. *Calculation of U.S. Value Added:*

To calculate ESP, the statute requires a reduction for value added to the subject merchandise in the United States. 19 U.S.C. § 1677a(e)(3). Samsung exported television parts for assembly in the United States by its related subsidiary and by an unrelated U.S. party. Samsung reported the fees paid to the unrelated U.S. party and maintained that it did not incur any additional general and administrative ("G & A") expenses or indirect selling expenses with respect to this merchandise. The final determination imputed these expenses based on similar expenses attributable to the subsidiary's U.S. assembly operations.

Samsung argues that its fees to the unrelated assembler encompassed all costs associated with the assembling operation, including G & A expenses and indirect selling expenses. Upon review of Samsung's arguments and the administrative record, ITA requests a remand. Zenith and the Unions protest that the fees might have covered the unrelated party's G & A expenses, but that they did not cover Samsung's expenses in dealing with that party.

The regulations provide that ESP should be reduced by the amount of value added in U.S. production or assembly operations, as determined from "the cost of material, fabrication, and other expenses incurred in

---

[11] In contrast, the regulations in force at the time of the original questionnaire requests set no specific timing requirements. *See* 19 C.F.R. § 353.46(a) (1980).

such production or assembly." 19 C.F.R. § 353.41(e)(3) (1990). Under the facts presented here, the unrelated party assembled the subject merchandise and thus incurred expenses in performing that assembly. These expenses are reflected in the fee charged to Samsung. In its dealings with the unrelated party, Samsung undertook no assembly operations and thus incurred no costs of assembly. Therefore, it properly reported no expenses beyond its fees to the assembler. ITA's request for remand is granted.

## CONCLUSION

This case is hereby remanded to Commerce with instructions (1) to apply its new VAT methodology, (2) to treat bad debt expenses as direct selling expenses if the data warrants an adjustment, (3) to reconsider its treatment of home market warranty expenses, (4) to consider home market inventory carrying cost information, and (5) to reconsider imputation of expenses in determining the amount of value added for ESP adjustment purposes. In all other respects, ITA's determination in the fourth administrative review of color televisions from Korea is sustained. Commerce is directed to submit its remand results within 90 days. Any comments thereon are due within twenty days thereafter. Commerce may respond in 12 days.