**AOC INTERNATIONAL, INC., Fulet Electronic Industrial Co., Ltd., Sampo Corp., and Tatung Co., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant,**

**Zenith Electronics Corporation, Defendant–Intervenor.**

**Court No. 87–01–00122.**

United States Court of International Trade.

Sept. 11, 1989.

Willkie Farr & Gallagher, Christopher Dunn, Washington, D.C., William J. Clinton, Zygmunt Jablonski and William B. Lindsey, for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Washington, D.C., Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson, Dept. of Commerce, Leila J. Afzal, for defendant.

Frederick L. Ikenson, P.C., J. Eric Nissley, Washington, D.C., for defendant-intervenor, Zenith Electronics Corp.

WATSON, Judge:

In this action, plaintiffs AOC International ("AOC"), Fulet Electronic Industrial Co. ("Fulet"), Sampo Corporation ("Sampo") and Tatung Company ("Tatung") challenge the final results of the first administrative review by the Department of Commerce, International Trade Administration ("ITA" or "Commerce") covering importations of color television receivers ("CTVs"), except for video monitors, from Taiwan which are subject to an antidumping duty order. *See* 51 Fed.Reg. 46895 (December 29, 1986).

Plaintiffs are the manufacturers and exporters of the CTVs to the United States and respondents in the administrative proceeding below. As such, plaintiffs have the standing to bring this action under 19 U.S.C. § 1516. Zenith Electronics Corporation, a defendant-intervenor, is a domestic manufacturer of the subject merchandise, and has also participated in the administrative review below as petitioner.

The Court has jurisdiction to review the final results of the administrative review under 28 U.S.C. § 1581(c).

## CALCULATIONS OF WARRANTY EXPENSES

■ Plaintiffs challenge the ITA's methodology of calculating the circumstance-of-sales adjustment for the differences in warranty expenses between the United States and home markets. The ITA made a determination that plaintiffs qualified for this

adjustment pursuant to the applicable law. In calculating the adjustment, however, the ITA included the cost of labor incurred in servicing warranties through an outside contractor in the U.S. market, while excluding the cost of labor incurred in servicing warranties by the in-house servicemen in the home market. Thus, the total amount of warranty expenses in the home market was limited to the spare part costs of servicing the warranty repairs during the review period. The ITA explained that the in-house labor costs are "fixed", rather than "variable", costs which, by definition, do not qualify as "directly-related" selling expense.

As a result of the ITA's calculations, the amount of warranty expenses in the U.S. market greatly exceeded those in the home market, even though plaintiffs offered longer warranty terms in the home market. This adjustment resulted in a corresponding increase of dumping margins.

Plaintiffs allege that the distinction made by the ITA in treating warranty-labor costs incurred by the outside servicing company in the United States as directly-related selling expenses, while treating the in-house labor costs in the home market as indirect selling expenses is arbitrary, and that it leads to absurd results. Plaintiffs argue that an overall eligibility of warranty expenses as directly-related selling expense under the applicable law extends to all warranty-related costs including the in-house labor costs in the home market.

Defendant argues that each element of an adjustment for the differences in warranty expenses must independently qualify as a directly-related selling expense in order to be included in the calculations of the adjustment, and that the overall eligibility of warranty expenses for an adjustment as directly-related selling expense does not *per se* qualify every component of warranty expenses to be included in the calculations.

Defendant refers to the established administrative practice as restated in the *Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change* (U.S. Department of Commerce, 1985 *"Adjustment Study"*), page 46:

> Direct expenses incurred include travel expenses of a servicemen going to and from the location of the servicing, hotel expenses incurred in travel to perform servicing, and payments to unrelated firms for performing servicing. Indirect warranty expenses include a servicemen's wages, depreciation on a service truck, and welfare, bonuses, retirement, depreciation, utilities, rent, and other G & A [general and administrative expenses] incurred by the service department.[1]

Defendant also refers to the ITA's explanation of the difference in treatment between "fixed" and "variable" expenses in *Industrial Phosphoric Acid from Israel,* 52 Fed.Reg. 25440 (July 7, 1987), which states:

> We consider these fixed costs to be general overhead expenses which the company incurs regardless of whether a particular sale is made. We deducted only the variable costs incurred at [the facility] which qualify as direct selling expenses because these costs are directly related to specific sales.[2]

Defendant argues that in-house labor costs are "fixed" costs which are incurred regardless of whether a particular sale is made and which, therefore, do not bear a direct relationship to the sales under consideration.

The Court does not accept the ITA's rationale that the in-house labor costs, which are incurred in servicing of warranty repairs, are fixed overhead costs which a company incurs irrespective of the terms of the sales under consideration. It would be contrary to common sense to maintain a

---

**1.** Defendant's Brief at 23 (emphasis omitted) (This study was prepared by the Department of Commerce and submitted to Congress pursuant to § 624 of the Trade and Tariff Act of 1984, Pub.L. 98–573, 98 Stat. 3024, 3041).

**2.** Id, emphasis added.

warranty servicing department and to pay salaries to the in-house servicemen, if no warranty terms were offered on the CTV sales. Similarly, a much smaller servicing department would be necessary to service warranties with more limited terms. The mere fact that in-house servicemen receive "fixed" salaries does not mean that the warranty-labor cost of the company is a fixed overhead expense which a company must incur irrespective of the terms of the sales under consideration. A per sale allocation of warranty-labor costs would vary depending on the terms offered with regard to each sale.[3]

The statutory purpose of the circumstance-of-sales adjustments is to allow for a fair "apple-to-apple" comparison of sales in the two markets "at the specific 'common' point in the chain of commerce" when the merchandise is leaving the "factory gates". *Smith–Corona Group, SCM Corp. v. U.S.*, 713 F.2d 1568, 1572 (CAFC, 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The circumstance-of-sales adjustments are intended to negate the distortive impact of the diverse commercial forces in the two different markets. Instead of negating this distortion, the ITA's differentiation in treatment of warranty-labor in the two markets clearly aggravates these distortions. The absurd result of the ITA's differentiation between the labor costs incurred through an outside servicing company in the United States and the in-house labor costs of the same nature is obvious. The ITA's calculations were bound to distort the price comparisons by including in the calculations the high labor-servicing costs in the U.S. market, without giving any credit for the labor costs which were incurred in the home market.

Similarly, the Court finds that the logic of defendant's reasoning that each individual component of a directly-related selling expense must independently qualify as a directly related selling expense is convolut-

ed. First of all, the Court finds no such requirement in the statute or the administrative regulations. According to 19 C.F.R. § 353.15a:

> In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowance will be made for *bona fide* differences in the circumstance of sales compared. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

The ITA does not dispute that plaintiffs met the requirement of this provision and established to its satisfaction that the *bona fide* differences in warranty expenses existed between the two markets. In fact, the ITA did make a determination to make an adjustment for the differences in warranty expenses.

The restrictive language of the regulations which requires "a direct relationship to the sales" refers to the *bona fide* differences in warranty expenses for which "a reasonable allowance will be made". There is no further requirement that each cost component of the directly-related selling expense must independently qualify as a directly-related selling expense in order to be included in the calculation of an adjustment.

It is difficult to follow the logic of the ITA's decision to grant an adjustment for the difference in warranty expenses, while disallowing a major cost component of this directly-related selling expense.

The ITA's failure to consider costs of warranty-labor in the home market as a reasonable measurement of the allowance is also contrary to 19 C.F.R. § 353.15(d), which states specifically that "[i]n determining the amount of the reasonable allowances for any differences in circumstances

---

**3.** Distinguish the facts of this case from those in *Rhone Poulenc, S.A. v. U.S.,* 8 CIT 47, 592 F.Supp. 1318 (1984), and *LMI–La Metalli Industriale, S.P.A. v. U.S.,* 712 F.Supp. 959 (CIT 1989), where in-house labor costs could not be

attributed exclusively to the difference in the circumstances of sales for which adjustment was claimed or to the products under consideration.

of sale, the Secretary will be guided primarily by the cost of such differences to the seller."

In view of these regulations, the Court does not need to hold that the eligibility of warranty expenses as directly-related selling expense *per se* qualifies the labor cost component of the warranty expenses as directly-related selling expense. The Court does find, however, that a cost component of a directly-related expense is not a separate selling expense which must independently meet the "direct relationship" test under the regulations, but is a proper measurement of the directly-related warranty expense. In *Smith–Corona, infra,* at p. 1577, the Court of Appeals authorized the use of costs as an acceptable basis for the circumstance-of-sale adjustments and stated that "absent evidence that costs do not reflect value, the Secretary may reasonably conclude that costs and value are directly related."

Finally, the ITA's own *Adjustment Study,* at 39, provides that no actual relationship to the specific sales under consideration is required in making adjustments for the differences in warranty expenses:

Examples of costs for which a circumstance-of-sale adjustment might be allowed are credit, advertising, technical services, special testing, commissions, and warranty costs. Normally ..., such costs must be directly related to the sales under consideration. For some expenses, however, we may use costs incurred during a particular period as the best information available for expenses associated with the sales under consideration. For example, we have used warranty costs incurred during the period of investigation or historical warranty data incurred over a longer period as best information for warranty costs associated with sales made during the period of investigation, since the latter would not be known until long after the period of investigation.

Defendant's allegation that "Commerce has consistently required that warranty costs be directly linked to sales of the merchandise under consideration" is, therefore, misleading.[4] The *Adjustment Study* indicates that the total costs of servicing warranties during a particular historical period are an acceptable measurement of the adjustment without any additional requirement to trace the relationships between these expenses and the specific sales under review.

The circumstance-of-sales adjustment for the differences in warranty expenses is rendered meaningless by the ITA's failure to include a major cost component of this expense in the home market. The Court concludes that in doing so, the ITA violated the requirement to make reasonable allowances for the *bona fide* differences in warranty expenses between the U.S. and home markets. The Court remands this determination to the ITA for reconsideration in accordance with this opinion.

## BAD DEBT EXPENSES

■ Sampo challenges the ITA's denial of a circumstance-of-sales adjustment for the differences in bad debt losses between the U.S. and home markets. Sampo substantiated its claim for this adjustment by tracing bad debt losses, which were incurred during the review period, to the individual bankrupt dealers and specific products.

The ITA rejected this claim for an adjustment on the ground that the bad debt losses were incurred in relation to prior sales and that, therefore, these losses were not directly related to the sales under the review.

The administrative practice of the ITA with regard to bad debt losses is explained in the notice of the final results of this review as follows:

Bad debt is by its nature an indirect selling expense since, under generally accepted accounting principles, bad debt is recovered over time by future price increases.

51 Fed.Reg. at 46899.

Defendant further explains this position by stating that "[b]ad debt losses are not

**4.** Defendant's Brief at 23.

direct selling expenses related to a particular sale unless and until they are written off. Until that time, the bad debt is merely an account receivable, and not an expense incurred with respect to a particular sale, because the debt could still be collected." [5]

Plaintiff disputes the ITA's characterization of the bad debt loss as "by its nature an indirect selling expense". In particular, plaintiff argues that these expenses should properly be treated as direct selling expenses, because an accurate interpretation of the generally accepted accounting principles, relied upon by the ITA, recognizes a direct impact of bad debt losses on prices. In addition, Sampo argues that bad debt losses should be treated exactly like warranty expenses, which are considered as directly-related expenses by the ITA, even though warranty expenses incurred during a review period also relate to prior sales.

In *Daewoo Electronics Company Ltd., v. U.S.*, 712 F.Supp. 931, 939 (CIT 1989), the court has addressed and accepted the analogy between warranty and bad debt expenses, stating that:

> The actual amount of both expenses are not usually known at the time of sales, because these types of expenses by their very nature are incurred sometime in the future when, and if, the merchandise malfunctions, or when a purchaser defaults.

The Court once again finds a vicious circle in the ITA's reasoning which "implies that an adjustment for bad debt can almost never be granted, because by the time [plaintiff] attempts to collect the debt, the period of review with regard to which the debt has been incurred, and could be considered a direct selling expense, would ordinarily have expired." *Id.*

The facts presented by this case demonstrate with an added clarity the impossible

criteria imposed by the ITA in order to qualify for an adjustment for bad debt losses. Sampo did attempt to submit an alternative bad debt claim with regard to the specific sales under review which became uncollectible while the administrative review was still in progress. This alternative submission was not honored by the ITA, because it was considered untimely when made after the preliminary results of the review.

Defendant-intervenor alleges that the bad debt expenses of the previous periods, unlike the warranty expenses, are not representative for the current period, because they depend on the fluctuating economic conditions of the market, rather than the merchandise under the review.

The Court finds that this argument of Zenith is relevant with regard to the method of calculating the expenses in question, rather than their substantive eligibility for an adjustment as directly-related selling expenses. The methods of calculating the adjustment for bad debt expenses is not now before the Court. The Court finds that the ITA's requirement that the bad debt expenses must be both incurred and written-off during the review period in order to qualify as directly-related selling expenses is not supported by the evidence on the record and is not in accordance with the applicable law.

The holding and reasoning in *Daewoo* is fully applicable and controlling in this case. The Court remands this issue to the ITA for reconsideration of an adjustment for the bad debt losses based on the company's bad debt experience during the period under review or another appropriate period.

### ANTIDUMPING DUTY ASSESSMENT CAP

■ Plaintiffs challenge the ITA's interpretation of 19 U.S.C. § 1673f(a).[6] Plain-

---

5. Defendant's Brief, at 18–19.

6. 19 U.S.C. § 1673f(a)(1) provides:
   If the amount of a cash deposit collected as security for an estimated antidumping duty order under section 1673b(d) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1673b(d) of this title is published shall be—

tiffs assert that according to this statutory provision, the assessment of antidumping duties should be limited to the preliminary deposit rates of the initial investigation with regard to those entries which were made prior to the final injury determination of the International Trade Commission ("ITC"). The ITA argues that both the preliminary and final deposit rates are proper alternative limitations on the assessment of antidumping duties, notwithstanding the single statutory reference to the deposit rates established pursuant to the preliminary determination.

In *Daewoo, infra,* which was issued after commencement of this case, the court held:

> This reference to the authorization provision of Section 733(d) of the Act indicates that that provision granted Commerce a continuing authority to suspend liquidation and to collect estimated duty deposits.
>
> This provision indicates that the ITA has the authority to collect updated deposits in the amount at which foreign market value of the merchandise exceeds its U.S. price and to make a corresponding change in the deposit rates when the ITA perfects its calculations as a result of its final determination.
>
> The Court does not agree, therefore, that Section 737(a) of the Act limits the actual assessment of antidumping duty to the preliminary rates of estimated duty.[7]

Plaintiffs "recognize", but "respectfully disagree" with this court's reasoning in *Daewoo.*[8] Plaintiffs fail to present any new arguments, however, which would persuade the Court to depart from its prior decision.

Defendant-intervenor does not disagree with the outcome of the decision in *Daewoo,* but seems to favor an alternative reasoning for this outcome. Defendant-intervenor argues that the application of the assessment cap is limited to those cases where cash, as opposed to posting of a bond, is the form of the duty deposit.

The Court adheres to the reasoning fully elaborated in *Daewoo* and affirms the ITA's application of both preliminary and final deposit rates respectively in effect at the time of the entries of the merchandise as a maximum assessment rates for the entries which are made prior to the final injury determination of the ITC. The Court does not need to address the alternative reasoning advocated by Zenith, because the ITA's interpretations of this provision, regardless of the type of security deposit, was upheld by the court on a much broader basis.

■ Plaintiff Sampo raises a separate issue with regard to the antidumping duty assessment cap. Sampo alleges that the preliminary determination of the ITA established a dumping margin of 0.64 percent, which was published in the *Federal Register.*[9] The ITA modified this preliminary rate to 11.34 percent and instructed the U.S. Customs Service to apply this modified preliminary rate for security bonding purposes. The ITA never published an amended preliminary determination to reflect the modified rate of preliminary dumping margins. Sampo argues that pursuant to 19 U.S.C. § 1673b(f) and 19 C.F.R. § 353.39(a)(2), the unpublished revision of the preliminary dumping margins does not have any legal force and effect. Sampo asserts, therefore that the preliminary rate of 0.64 percent is the maximum assessment rate applicable to the subject entries under 19 U.S.C. § 1673f(a)(1).

Defendant concedes the validity of the publication requirement and submits that it will apply the published rate of 0.64 percent as an antidumping duty assessment cap for the applicable entries of Sampo's merchandise. Defendant-intervenor argues, however, that the actual notice of the modified deposit rate to Sampo is sufficient

---

(1) disregarded, to the extent the cash deposit collected is lower than the duty under the order ...

**7.** *Id.* at 39 (footnote omitted).

**8.** Plaintiffs' Reply Brief at 39, footnote 23.

**9.** *Color Television Receivers from Taiwan,* 48 Fed.Reg. 48490 (October 19, 1983).

to apply the modified rate of 11.34 percent for the purposes of the assessment cap.

The Court upholds the ITA's position that the publication requirement is a legally binding condition for the antidumping duty assessment purposes pursuant to the express and unequivocal provision of the controlling statute.

## ADDITIONAL ISSUES ON REMAND

The Court remands the final results to the ITA for reconsideration of the additional issues which are specifically conceded by defendant.

■ Defendant requests a remand for recalculation of FMV based on constructed value for Tatung's CTVs in the home market. Defendant does not address the specific arguments of Tatung challenging the ITA's methodology of calculating the constructed value. Instead, defendant concedes the lack of "adequate explanation" of its calculations in the record and requests a remand to "review and make corrections as necessary" and "to explain the calculation methodology"[10]

The Court's finding with regard to this issue is limited to a conclusion that the final results are not supported by substantial evidence on the record, because there is admittedly no record of the ITA's calculations with regard to this issue. The Court postpones addressing the specific arguments of Tatung, if necessary, until such time when the ITA submits the remand record with regard to this issue.

Similarly, defendant requested a remand to "recalculate AOC's inland freight and explain its calculation methodology."[11] The Court grants this request for a remand.

■ Defendant also requests a remand of the ITA's determination of FMV with regard to discounts and rebates which Tatung paid to distributors for trade-ins of used televisions by the dealers in the home market. Defendant-intervenor opposes a remand to adjust FMV for the discounts and rebates which are made in connection with the trade-ins. Defendant-intervenor argues that pursuant to the established administrative practice of the ITA, no such adjustment should be allowed.

Plaintiff distinguishes the facts of the administrative precedent in *Drycleaning Machinery from West Germany*, 50 Fed. Reg. 32154 (1985), which is relied upon by defendant-intervenor. Tatung argues that since the used machinery was actually sold by respondents in that case, the discounts offered for the traded-in drycleaning machinery were expected to be recouped and thus eliminated. In contrast, the used televisions in these case were merely "disposed", and the standard discounts were offered by Tatung irrespective of the condition of the used televisions.

The Court recognizes the rrxs distinction between the price reduction as compensation for the traded-in merchandise, as opposed to discounts and rebates which are offered as a marketing tool to encourage new sales, irrespective of the value of the traded-in merchandise. The Court remands the final results to the ITA in order to adjust FMV, as appropriate.

■ The ITA also concedes plaintiffs' argument that an adjustment for "advertising and sales promotion expenses should have been allocated on a product-line rather than model-specific basis."[12] The Court grants this request for a remand over an objection of defendant-intervenor that this request constitutes a *post hoc* change of policy which should not be allowed.[13] Defendant's admission that the methodology used by the ITA to calculate an adjustment for advertising expenses is not defensible on the record of this case shall not be precluded merely because the policy to change this methodology was adopted by the ITA after the completion of the review under consideration. The Court remands this issue to the ITA for reconsideration.

Finally, the ITA requests a remand to add the amount of commodity taxes forgiv-

---

10. Defendant's Brief at 37–38.

11. *Id.* at 38.

12. *Id.* at 38.

13. Intervenor's Brief at 33.

en upon exportation of CTVs to the United States, instead of subtracting this amount from FMV, as required by the statute and this court's decision in *Zenith Electronics Corp. v. U.S.*, 10 CIT 268, 633 F.Supp. 1382 (1986) App.Doc. No. 88–1259 and 88–1260 (CAFC). The Court grants defendant's request for a remand with regard to this issue.

## CONCLUSION

The Court remands the final results of the administrative review to the ITA for reconsideration in accordance with this opinion. The ITA is instructed to file the remand results within 90 days from the date of this decision.

IT IS SO ORDERED.