**SHARP CORPORATION and Sharp Electronics Corporation, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 94–1412.

United States Court of Appeals, Federal Circuit.

Aug. 11, 1995.

Christopher P. Johnson, Donovan Leisure Newton & Irvine, New York City, argued for plaintiffs-appellants. Peter J. Gartland, Christopher K. Tahbaz and Fusae Nara, Donovan Leisure Newton & Irvine, New York City, were on the brief for plaintiffs-appellants.

Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-ap-

pellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin., Berniece A. Browne, Sr. Counsel and Duane W. Layton, Sr. Atty. and Intern. Dispute Counsel, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce. Of counsel was Terrence J. McCartin.

Before NEWMAN, MAYER, and BRYSON, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Sharp Corporation and Sharp Electronics Corporation (collectively "Sharp") appeal the judgment of the United States Court of International Trade, *Sharp Corp. v. United States*, 852 F.Supp. 1072 (Ct. Int'l Trade 1994), affirming an antidumping administrative review by the Commerce Department's International Trade Administration ("Commerce"). *Television Receivers, Monochrome and Color, From Japan*, 56 Fed.Reg. 37,078 (Dep't Comm.1991) (final admin. review) (hereinafter *"Final Results"*).

*A*

Television receivers from Japan are subject to an antidumping duty order. *Television Receiving Sets, Monochrome and Color, From Japan*, 5 Cust. B. & Dec. 151 (1971). The issue is the correctness of Commerce's classification of certain transportation expenses that affect the calculation of the antidumping margin.

Sharp Corporation manufactures television receivers in Japan, for sale in Japan and in other countries. Sales in the United States are made by Sharp Electronics Corporation, a wholly owned subsidiary. Sharp Corporation incurs movement expenses including inland freight to port of shipment in Japan; ocean, marine, or air freight to the United States port; and port to warehouse freight in the United States. Sharp Electronics Corporation then sells and ships the television re-

ceivers to unrelated customers in the United States.

For sales in Japan, Sharp Corporation distributes its television receivers through four distributors to whom it is related. When shipping merchandise to these distributors Sharp incurs inland freight expenses that are not directly linked to any particular sales. Sharp's Japanese distributors sell the sets and ship them directly to unrelated customers in Japan.

These transactions are viewed against the backdrop of the United States' antidumping laws. Tariff Act of 1930, §§ 731–739, 19 U.S.C. §§ 1673–1673h (1988 & Supp. V 1993) (amended 1994).[1] The antidumping laws prohibit the sale of foreign products in the United States at a price lower than the products' fair value in the home country. Under 19 U.S.C. § 1673 Commerce decides whether dumping has occurred. If so, and if other requirements not here in issue are met, § 1673 authorizes Commerce to impose an antidumping duty equal to the dumping margin, which is the amount by which the foreign market value ("FMV") exceeds the United States price ("USP"). *See generally Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1567 (Fed.Cir.1994); *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 399–400 (Fed.Cir.), *cert. denied*, ⸺ U.S. ⸺, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994); *Zenith Elecs. Corp v. United States*, 988 F.2d 1573, 1576 (Fed.Cir.1993); *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1 Fed. Cir. (T) 130, 132 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); 19 C.F.R. § 353.2(f)(1) (1994) (defining dumping margin).

The statute defines USP, the subtrahend which is subtracted from FMV to get the dumping margin, as either the United States purchase price (PP) or the exporter's sales price (ESP), whichever is appropriate. Tariff Act of 1930, § 772(a), 19 U.S.C. § 1677a(a) (1988) (amended 1994); 19 C.F.R. § 353.41(a) (1994). Commerce chooses a basis appropri-

---

1. Congress recently amended the antidumping laws. Uruguay Round Agreements Act, Pub L. No. 103–465, tit. II, 108 Stat. 4809, 4842 (1994). Although many of the statutory terms have been renamed (*e.g.,* "exporters price" replaced "pur-

chase price," "constructed exporters price" replaced "exporters sales price," and "normal value" replaced "foreign market value"), the substance of the provisions considered in this opinion remain the same.

ate to ensure that its calculations depend on arm's length transactions. *See Koyo Seiko,* 36 F.3d at 1567; *Smith–Corona,* 713 F.2d at 1572, 1 Fed.Cir. (T) at 132. Commerce uses the ESP if the foreign manufacturer imports through a related company in the United States. Commerce then applies § 1677a(c) to calculate ESP from the price at which the United States company sells to unrelated purchasers. 19 C.F.R. § 353.41(c); *see Timken Co. v. United States,* 37 F.3d 1470, 1477–78 (Fed.Cir.1994). Certain adjustments are authorized. For example, § 1677a(d)(2)(A) directs Commerce to reduce USP by the costs (including import duties) of bringing the merchandise to the place of delivery in the United States. 19 C.F.R. § 353.41(d)(2)(ii). Commerce calls these costs "movement expenses." And under § 1677a(e)(2) Commerce subtracts selling expenses, both direct and indirect, from ESP. *See Koyo Seiko,* 36 F.3d at 1573; 19 C.F.R. § 353.41(e)(2).

Commerce explained how it calculated Sharp's dumping margin. *Television Receivers, Monochrome and Color, From Japan,* 56 Fed.Reg. 26,061, 26,062 (Dep't Commerce 1991) (prelim. admin. review) (hereinafter *"Preliminary Results"*). The calculations included three types of adjustments to USP.[2] First, Commerce deducted "Japanese inland freight and insurance and Japanese brokerage and handling as related to U.S. exports," as described in § 1677a(d)(2)(A). Second, Commerce adjusted ESP figures for "ocean freight, marine insurance, U.S. inland freight, U.S. brokerage and handling charges, U.S. customs duties, discounts, rebates, commissions to unrelated parties, credit and warranty expenses, advertising and sales promotion expenses, export selling expenses incurred in Japan, and U.S. subsidiaries' selling expenses," as authorized by § 1677a(e). Third, Commerce added "the Japanese commodity tax that was not collected by reason of the exportation of the merchandise," as set forth in § 1677a(d)(1)(C).

*Preliminary Results* at 26,062; *see Zenith,* 988 F.2d at 1580.

FMV, the minuend in the dumping margin equation, is based on home market sales, third country sales, or constructed value. Tariff Act of 1930, § 773, 19 U.S.C. § 1677b (1988) (amended 1994); 19 C.F.R. §§ 353.43–.59 (1994). When comparing FMV to USP, § 1677b(a)(4) authorizes three types of reasonable allowances, if they are proven to the satisfaction of Commerce. *See Smith–Corona,* 713 F.2d at 1573, 1 Fed.Cir. (T) at 134; 19 C.F.R. § 353.54. First, under § 1677b(a)(4)(A) Commerce considers differences between quantities sold in the foreign and domestic markets. 19 C.F.R. § 353.55. Second, under § 1677b(a)(4)(B) Commerce considers differences in the circumstances of sales, generally limiting allowances to "circumstances which bear a direct relationship to the sales compared." 19 C.F.R. § 353.56(a); *Gray Portland Cement,* 13 F.3d at 401–403 (holding that home market freight expenses are not deductible in PP comparisons when they are indirect); *see Zenith,* 988 F.2d at 1581. Third, under § 1677b(a)(4)(B) Commerce considers differences in physical characteristics of the products. 19 C.F.R. §§ 353.57 (1994); *see Smith–Corona,* 713 F.2d at 1582, 1 Fed.Cir. (T) at 142–43.

In calculating Sharp's FMV, Commerce deducted from FMV "inland freight, brokerage and handling expenses, discounts, rebates, royalties, credit, advertising and sales promotion expenses, warranty expenses, and differences in commodity taxes, packing, and physical characteristics of the merchandise," each of which Commerce found to fall within provisions of § 1677b(a)(4). *Preliminary Results* at 26,062. In comparisons based on ESP, Commerce also deducted "indirect selling expenses from FMV not exceeding the amount of U.S. indirect selling expenses." *Preliminary Results* at 26,062; *see* 19 C.F.R. § 353.56(b)(2). This last deduction, called the *"ESP offset",* is not provided for in the statute.

---

**2.** The Court of International Trade stated that "Commerce treated these sales as ESP transactions." *Sharp,* 852 F.Supp. at 1073. This statement may have been incorrect. *See Preliminary Results* at 26,062 (explaining that "the department used purchase price (PP) or exporter's sales

price (ESP) ... as appropriate."); *Final Results* at 37,080 cmt. 9. The sole dispute in this appeal, however, concerns deductions from FMV "in comparisons with exporter's sales price." *See* 19 C.F.R. § 353.56(b)(2) (1994). Therefore, if there was a mistake it does not affect our decision.

The ESP offset was created by Commerce, and approved by the courts, as a means to effect a fair comparison between FMV and USP. *Smith–Corona,* 713 F.2d at 1578, 1 Fed.Cir. (T) at 139–40. Because the FMV allowance under § 1677b(a)(4)(B) for circumstances connected to the sale includes only direct selling expenses, while the statutory adjustment to ESP under § 1677a(e)(2) encompasses both direct and indirect selling expenses, Commerce was concerned that it would be unfair to compare FMV to USP based on ESP. *Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 1036–37, 3 Fed.Cir. (T) 83, 87 (1985). To remedy this perceived disparity Commerce created the ESP offset, a special allowance applicable only when USP is based on ESP. *Smith–Corona,* 713 F.2d at 1577–78, 1 Fed.Cir. (T) at 139–41; 19 C.F.R. § 353.56(b)(2).

Applying the ESP offset, Commerce reduces the FMV by the amount of indirect selling expense incurred in making foreign sales. That allowance, however, may not exceed the ESP offset cap, which is set at the amount of indirect selling expense incurred on sales in the United States. The Federal Circuit has described the ESP offset as a "proper and reasonable exercise" of Commerce's "authority to administer the statute fairly." *Smith–Corona,* 713 F.2d at 1577–79, 1 Fed.Cir. (T) at 139–41. Similarly, the ESP offset cap has been held not to conflict with the statute and to have a rational basis. *Silver Reed,* 753 F.2d at 1040, 3 Fed.Cir. (T) at 91.

When an antidumping duty order is in place, upon request Commerce may conduct an administrative review to compare USP with FMV based on financial information for the year being reviewed. Tariff Act of 1930, § 751, 19 U.S.C. § 1675 (1988) (amended 1994). In 1989 Commerce duly commenced an administrative review of Sharp's television receiver imports for the eighth annual review period (March 1, 1986, through February 28, 1987) and the tenth annual review period (March 1, 1988, through February 28, 1989). *Initiation of Antidumping and Countervailing Duty Administrative Review,* 54 Fed. Reg. 18320 (Dep't Comm.1989).

The effect of the Commerce ruling is that the movement costs of delivering television sets to the United States are not selling expenses at all, and thus neither direct nor indirect selling expenses. *Final Results* at 37,080. Sharp argued that because these movement costs are not directly linked to any sale they are indirect expenses and thus should be included in the ESP offset cap. The Court of International Trade affirmed Commerce's position.

The issue on appeal is whether Commerce correctly declined to include the expense of shipping the merchandise to the United States in the ESP offset cap. Including such expense would increase the cap and thus allow the manufacturer to include, in the ESP offset, more of the indirect selling costs from its home market. A larger ESP offset would reduce the FMV, and thus decrease the dumping margin.

*B*

■ The Court of International Trade reviews Commerce's determinations in an antidumping duty review to ascertain if that decision is supported by substantial evidence on the entirety of the record, and is in accordance with law. 19 U.S.C. § 1516a(a)(2)(B)(iii), (b)(1)(B) (1988 & Supp. V 1993). On appeal the Federal Circuit applies the same standard. *Timken,* 37 F.3d at 1473. No facts are in dispute, and the legal issue is narrowly drawn. Sharp does not challenge Commerce's treatment under 19 U.S.C. § 1677a(d)(2)(A) of movement expenses from the factory in Japan to the point of distribution in the United States. Sharp agrees that the expenses in dispute were movement expenses, although Sharp contends they were also expenses incurred in selling the television receivers. The question is whether Commerce, when interpreting 19 C.F.R. § 353.56(b)(2), properly refused to include such expenses in the ESP offset cap.

■ In determining the meaning of an unclear regulation, the agency's own interpretation is entitled to deference. *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991). If it is reason-

able, the agency's interpretation shall be upheld as against other reasonable interpretations. *Shalala v. Guernsey Memorial Hosp.,* —— U.S. ——, ——, 115 S.Ct. 1232, 1236, 131 L.Ed.2d 106 (1995); *Ah Sam v. United States,* 682 F.2d 925, 931, 230 Ct.Cl. 596 (1982), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983). Thus the administrative interpretation is afforded "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Immigration and Naturalization Serv. v. Stanisic,* 395 U.S. 62, 71, 89 S.Ct. 1519, 1525, 23 L.Ed.2d 101 (1969); *Mast Industries, Inc. v. United States,* 822 F.2d 1069, 1072, 5 Fed. Cir. (T) 105, 109 (1987).

19 C.F.R. § 353.56(b)(2) provides:

> In comparisons with exporter's sales price, [Commerce] will make a reasonable deduction from foreign market value for all expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling such or similar merchandise up to the amount of the expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling the merchandise.

The expenses "described in paragraph (a)(1) or (a)(2)" are direct selling expenses. The regulation thus describes the ESP offset as a deduction from FMV for all selling expenses except direct selling expenses incurred in selling such or similar merchandise. Commerce interpreted that text to denote the indirect selling expenses incurred in the home market. The regulation then describes the ESP offset cap in the words "up to the [indirect expenses] incurred in selling the merchandise." Commerce interpreted that text to denote only the indirect selling expenses incurred in the United States. Sharp argues that the regulation should be interpreted to include the movement expenses from Japan to the United States in the ESP offset cap, and that precedent supports this interpretation.

When moving the television receivers from the factory in Japan to the point of distribution in the United States, Sharp incurred "movement expenses" which Commerce deducted from USP pursuant to § 1677a(d)(2)(A). Sharp states that these expenses were "incurred in selling" the imported television receivers, and that indirect selling expenses under § 1677a(e)(2) are intended to be included in the ESP offset cap. Commerce's explanation is that since the expenses of shipment to the United States are included in the USP, and § 1677a(d)(2)(A) requires reduction of the USP by the amount attributed to movement expenses, these expenses are not properly included in the offset cap. Commerce also stated that movement expenses to the United States are not indirect selling expenses.

Commerce adopted this interpretation when it promulgated these regulations. *Antidumping Duties,* 54 Fed.Reg. 12,742, 12,768–69 (Mar. 28, 1989). Commerce's interpretation is buttressed by the structure of the statute. The statute describes selling expenses in § 1677a(e)(2), which permits adjusting ESP (and thus USP) for "expenses . . . incurred . . . in selling." In contrast, the statute describes movement expenses in § 1677a(d)(2)(A), which permits reducing USP (whether derived from ESP or PP) for "expenses . . . incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." It is fully consistent with these two provisions to treat movement expenses are not "expenses incurred in selling" within the meaning of § 353.56(b)(2). By distinguishing U.S. movement expenses and U.S. selling expenses, the statutory plan supports Commerce's implementation whereby the ESP offset cap limits the adjustment to FMV to the indirect selling expenses incurred in the United States that are deducted pursuant to 19 U.S.C. § 1677a(e)(2).

Sharp argues that Commerce's interpretation of the ESP offset cap conflicts with Commerce's prior interpretation of the ESP offset. In that prior interpretation Commerce treated Sharp's freight costs, from its factories to its home market distributors in Japan, as indirect selling expenses, and therefore included them in the ESP offset. Sharp states that these expenses are "movement expenses," and that if Commerce includes such expenses incurred in the home market in the ESP offset under § 353.56(b)(2) cl. 1, then it must include movement expenses incurred in exporting

goods to the United States in the ESP offset cap under the corresponding language of § 353.56(b)(2) cl. 2.

 The interpretation Sharp advances, however, finds no support in either the regulation or the statute. Movement expenses, which might more accurately be called "export expenses," are expenses "incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States" and include items such as United States import duties. Simply put, whether home market freight expenses are considered direct or indirect has nothing to do with whether movement expenses should be added to the ESP offset cap. Thus, the fact that Commerce treats home market freight expenses as indirect selling costs under § 353.56(b)(2) cl. 1 is not inconsistent with Commerce's refusal to include actual § 1677a(d)(2)(A) movement expenses within the ESP offset cap under § 353.56(b)(2) cl. 2.

Commerce's interpretation reasonably implements the purpose of the ESP offset to ameliorate the inequity that arose when Commerce calculated USP from ESP. Under 19 U.S.C. § 1677a(d)(2), certain expenses are deducted from USP whether USP is calculated from ESP or PP; however, indirect selling expenses under § 1677a(e) are deducted from USP only when USP is calculated from ESP. Commerce created the ESP offset so that the § 1677a deductions would not skew the comparison of selling prices in the United States and the home markets. However, Commerce offset only the unequal adjustment for indirect selling expenses under · § 1677a(e)(2), not the uniform adjustment for movement expenses under § 1677a(d)(2)(A). Since movement expenses are deducted from USP, whether the calculation is based on ESP or PP, these expenses do not contribute to the perceived disparity that Commerce intended to fix when it established the ESP offset.

To keep the comparison fair, Commerce created the ESP offset, *i.e.*, a deduction from FMV of the indirect sales costs actually incurred in the home market. This deduction, however, is limited in amount to the ESP offset cap, *i.e.*, indirect sales costs actually incurred in the United States. The ESP offset was not intended to factor home market indirect sales costs in the equation so as to alter the dumping margin. The purpose was to compensate for the inclusion of U.S. indirect sales costs in the dumping margin equation, so that the result would not reflect differences in indirect sales costs. We acknowledged and approved this goal when we held that Commerce could use the ESP offset cap and need not allow deductions from FMV of all indirect home market expenses.

The judgment of the Court of International Trade is

*AFFIRMED.*