**ZENITH ELECTRONICS CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant–Appellant,**

v.

**AOC INTERNATIONAL, INC., Fulet Electronic Industrial Co., Ltd., Sampo Corp., and Tatung Co., Defendants–Appellees,**

and

**Capetronic (BSR) Ltd., Defendant.**

No. 95–1139.

United States Court of Appeals,
Federal Circuit.

Feb. 12, 1996.

Rehearing Denied April 11, 1996.

John K. Lapiana, Attorney, Department of Justice, Washington, DC, argued, for defendant-appellant, The United States. Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director, Commercial Litigation Branch, Department of Justice, Washington, DC, were on the brief, for defendant-appellant. Of counsel was Velta A. Melnbrencis. Also on the brief was Rebecca Rejtman, Attorney–Advisor, Office of the General Counsel for Import Administration, U.S. Department of Commerce, of counsel.

Christopher M. Curran, White & Case, Washington, DC, argued, for defendants-appellees, AOC International, Inc., Fulet Electronics Industrial Co., Ltd., Sampo Corp., and Tatung Co. William J. Clinton, David E. Bond and Lisa L. Hubbard, White & Case, Washington, DC, were on the brief, for defendants-appellees.

Before MAYER, Circuit Judge, SKELTON, Senior Circuit Judge, and LOURIE, Circuit Judge.

MAYER, Circuit Judge.

The United States appeals the judgment of the United States Court of International Trade in *AOC Int'l, Inc. v. United States*, 721 F.Supp. 314 (Ct. Int'l Trade 1989), *aff'd after remand sub nom. Zenith Elecs. Corp. v. United States*, 865 F.Supp. 890 (Ct. Int'l Trade 1994), holding that the International Trade Administration of the United States Department of Commerce (Commerce), incorrectly calculated a circumstances-of-sale adjustment in determining antidumping duties to be imposed on color television receivers from Taiwan. Because the court did not defer to Commerce's reasonable interpre-

tation and application of the statute at issue, we reverse and remand.

### Background

Under antidumping laws, Commerce is required to impose additional duties on imported products being sold, or likely to be sold, at less than their fair value, to the harm of a domestic industry. 19 U.S.C. § 1673 (1982).[1] The amount of such duties, known as the dumping margin, is equal to the "amount by which the foreign market value exceeds the United States price for the merchandise." *Id.* Commerce may calculate the United States price and the foreign market value on several alternative bases. United States price is calculated as either the United States "purchase price" or the "exporter's sales price," whichever is appropriate. *Id.* § 1677a (1982 & Supp.1984); *see generally Sharp Corp. v. United States,* 63 F.3d 1092, 1093–94 (Fed.Cir.1995); *Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1567 (Fed.Cir. 1994) (generally, if "the domestic importer is unrelated to, and independent of, the foreign producer, purchase price is used," otherwise exporter's sales price is used). Foreign market value, on the other hand, is computed on the basis of home market sales, third country sales, or constructed value, as appropriate. 19 U.S.C. § 1677b (1982 & Supp.1984); *see Smith–Corona Group v. United States,* 713 F.2d 1568, 1573 (Fed.Cir.1983) (home market sales are preferred; however, in the absence of adequate sales, third country sales or constructed value may be used).

"To ensure that the quantum of antidumping duties is calculated in a fair manner, both foreign market value and United States price are subject to certain adjustments in order to achieve a common point at which to perform the price comparison." *Koyo Seiko,* 36 F.3d at 1568; *see also Torrington Co. v. United States,* 68 F.3d 1347, 1352–53 (Fed.Cir.1995). After Commerce makes such adjustments, the two values are compared, and the amount by which foreign market value exceeds United States price is imposed as an additional antidumping duty. At issue in this appeal is Commerce's application of the "circumstances of sale" adjustment to foreign market value, set out at 19 U.S.C. § 1677b(a)(4)(B), in determining antidumping duties to be imposed on color television receivers from Taiwan.

In 1984 Commerce published an antidumping duty order on color television receivers, other than video monitors, from Taiwan. Color Television Receivers, other than Video Monitors, from Taiwan, 49 Fed.Reg. 18,337 (Dep't Comm.1984) (final determination). Thereafter, it published the final results of its first administrative review of that order, covering the period October 19, 1983, through March 31, 1985. Color Television Receivers, other than Video Monitors, from Taiwan, 51 Fed.Reg. 46,895 (Dep't Comm. 1986) (final admin. review). In determining the dumping margins for that period, Commerce allowed the claims of AOC International, Inc.; Fulet Electronic Industrial Co., Ltd.; and Sampo Corp.[2] (collectively "the CTV companies") for circumstances-of-sale adjustments to their respective foreign market values,[3] to account for differences between warranty expenses in their home market and those in the United States.[4] *Id.* at

---

**1.** Congress recently amended the antidumping laws. *See* Uruguay Round Agreements Act (URAA), Pub.L. No. 103–465, tit. II, 108 Stat. 4809 (1994); *see also Sharp Corp. v. United States,* 63 F.3d 1092, 1093 n. 1 (Fed.Cir.1995). These amendments, however, do not apply to administrative reviews initiated before January 1, 1995. *See Torrington Co. v. United States,* 68 F.3d 1347, 1352 (Fed.Cir.1995). Accordingly, we use the antidumping laws in effect during the period in question. For simplicity, we speak in the present tense when referring to these statutes.

**2.** Tatung Co. did not participate in the issue that is the subject of this appeal before the trial court or here.

**3.** In calculating foreign market value, Commerce used "home market price, third-country price, or constructed value, ... as appropriate." Color Television Receivers, other than Video Monitors, from Taiwan, 51 Fed.Reg. 37,317 (Dep't Comm. 1986) (prelim. admin. review). With respect to the United States prices, Commerce used both purchase price and exporter's sales price, as appropriate. *Id.*

**4.** The CTV companies offered longer warranty terms in connection with television sales in the foreign market than in the United States.

46,898–900. However, Commerce limited the adjustments to the cost of parts used in performing the warranty repairs. It denied the CTV companies' claims for adjustments for the salaries and benefits they paid to in-house technicians who serviced the warranties. *See id.* (comments 11, 22, and 25). Commerce determined that the salaries and benefits of in-house warranty service personnel are indirect selling expenses that would have been incurred regardless of the sales under consideration. *See, e.g., id.* at 46,898 (comment 11). Consequently, it concluded that the CTV companies were not entitled to an adjustment for those expenses under section 1677b(a)(4)(B).

By contrast, in adjusting the United States prices of the CTV companies for warranty expenses, Commerce included the cost of labor incurred in servicing warranties through outside contractors. Color Television Receivers, other than Video Monitors, from Taiwan, 51 Fed.Reg. 37,317 (Dep't Comm.1986) (prelim. admin. review); *AOC Int'l,* 721 F.Supp. at 316. As a result, the adjustments for warranty expenses in the United States exceeded those in the home market, resulting in corresponding increases in the CTV companies' dumping margins. 721 F.Supp. at 316.

The CTV companies filed suit in the Court of International Trade, alleging that Commerce had abused its discretion in limiting the circumstances-of-sale adjustments to the cost of parts used in servicing the warranties. The CTV companies argued that all warranty-related costs are directly-related selling expenses subject to adjustment, including in-house labor costs in the home market. In response, the United States argued that "the overall eligibility of warranty expenses for an adjustment as directly-related selling expense [sic] does not *per se* qualify every component of warranty expenses to be included" in the adjustment. *Id.* Rather, each component of an adjustment must independently qualify as a directly-related selling expense.

The Court of International Trade agreed with the CTV companies. In granting the companies' motion for judgment on the administrative record, it held that there is no requirement in statute or regulation that "each individual component of a directly-related selling expense" independently qualify as such. *Id.* at 317. The court said that in-house labor costs incurred in servicing warranty repairs are not "fixed" costs incurred regardless of the sales under consideration. *Id.* at 316. Therefore, it remanded the case to Commerce for reconsideration. The court subsequently affirmed the remand results, *Zenith Elecs. Corp.,* 865 F.Supp. 890, and this appeal followed.

Commerce argues that the Court of International Trade "erred in concluding that Commerce must accept all identifiable and quantifiable cost components contained in a claimed adjustment—regardless of whether all such components affect price." It claims that such an approach "is baldly at odds" with statutory and regulatory requirements, as well as legislative history and its long-standing practice that only costs directly related to the sales under consideration be included in the adjustment. Commerce also contends that the court was wrong in substituting its conclusion that in-house warranty labor expenses are direct expenses for Commerce's determination that they are not.

*Discussion*

 The two issues before us are: whether the Court of International Trade erred in concluding that Commerce must include all cost components comprising a claimed circumstances-of-sale adjustment in making such an adjustment; and whether the court erred in holding that in-house warranty labor costs are direct expenses, and must be included in any such adjustment. On the first issue, we decide the proper interpretation of the governing statutes *de novo. Koyo Seiko,* 36 F.3d at 1570. We are guided, however, by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which says:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Con-

gress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). Consequently, if there is no unambiguously expressed congressional intent, we must interpret the statute with deference to Commerce's interpretation, not that of the Court of International Trade. *See Daewoo Elecs. Co. v. International Union,* 6 F.3d 1511, 1516 (Fed.Cir.1993). "To survive judicial scrutiny, [Commerce's] construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation.... Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko,* 36 F.3d at 1570 (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978)). "These tenets extend to their limits" when Commerce interprets the antidumping laws, for it is the "master" of those laws, and its interpretations are "worthy of considerable deference." *Daewoo Elecs.,* 6 F.3d at 1516.

■ With respect to the second issue, Commerce's administrative review determinations must be sustained "unless they are unsupported by substantial evidence on the record, or are otherwise not in accordance with law." *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1189 (Fed.Cir.1990). Substantial evidence " 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

In examining the language of the statute and the legislative history, we see no unambiguously expressed congressional intention that in making a circumstances-of-sale adjustment, Commerce must include all cost components of the specific circumstance on which the adjustment is based. We believe Commerce's interpretation of the circumstances-of-sale provision is reasonable, and its application of that interpretation here is in accordance with law and supported by substantial evidence.

### A.

We begin with an examination of the language of the statute itself. *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). In pertinent part, the provision governing adjustments to foreign market value states: "In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ... other differences in circumstances of sale; ... then due allowance shall be made therefor." 19 U.S.C. § 1677b(a)(4) (1982).[5] It is apparent that the "statute provides no specific guidelines for the treatment of warranty expenses." *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1583 (Fed. Cir.1993). Nor does it establish any framework for Commerce to use in determining what "allowance" is "due" when making a circumstances-of-sale adjustment. Rather, in the context of this case, the statute provides only that if there is a difference between United States price and foreign market value, and if Commerce is satisfied that at least part of that difference is due to a difference between the warranty terms offered in Taiwan and those offered in the

---

5. Congress amended section 1677b in the URAA. *See supra* note 1. Generally, it replaced the concept of "foreign market value" with "normal value." *See* 19 U.S.C. § 1677b (1994). However, the circumstances-of-sale adjustment provision remains largely unchanged. *Id.* § 1677b(a)(6)(C)(iii).

United States, then it shall make "due allowance therefor."

We do not read this provision as either mandating or prohibiting Commerce's analysis of the individual cost components of a claimed adjustment to determine whether the difference between foreign market value and United States price is due at all to such components. Section 1677b(a)(4) "does not expressly limit the exercise of the Secretary's authority to determine adjustments, nor does it include the precise standards or guidelines to govern the exercise of that authority." *Smith–Corona Group v. United States*, 713 F.2d 1568, 1575 (Fed.Cir.1983). Indeed, the statute does not "prescribe any method for determining allowances. Congress has deferred to the Secretary's expertise in this matter." *Id.* Thus, "[a]bsent a specific provision forbidding" Commerce from analyzing each cost component of a claimed circumstances-of-sale adjustment, "we cannot say that the express language of the statute clearly invalidates" its practice of doing so. *Id.* at 1576.

Nor does the legislative history reflect any congressional intent that would be dispositive. The circumstances-of-sale provision was enacted in 1958. Act of Aug. 14, 1958, Pub.L. No. 85–630, § 2, 72 Stat. 583; *see also Koyo Seiko*, 36 F.3d at 1572. The Senate Report on that act says only that the provision "is designed to facilitate efficient and fair comparison between foreign market value and price to the United States market," offering "differences in terms of sale" as an example of a differing circumstance for which an adjustment could be made. S.Rep. No. 1619, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.C.C.A.N. 3498, 3504.

Similarly silent on the precise issue before us, yet helpful in resolving this case, is the legislative history on the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144, which created a comprehensive antidumping statute and approved the trade agreements negotiated in the Tokyo Round of Multilateral Trade Negotiations. *See Torrington Co. v.*

*United States,* 44 F.3d 1572, 1580 (Fed.Cir. 1995). The House Report explains that:

> Regulations will establish groups of adjustments based on types of adjustments currently recognized, that is, differences in circumstances of sale (e.g. ... warranties, ...). ...
>
> Such adjustments to the price of similar merchandise sold in the exporter's home market or third country markets are appropriate in determining FMV. However, if adjustments are improperly made, the result may be an unjustifiable reduction in or elimination of the dumping margin. Therefore, the Committee intends that adjustments should be permitted if they are reasonably identifiable, quantifiable, *and directly related to the sales under consideration* and if there is clear and reasonable evidence of their existence and amount.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979) (emphasis added). The quoted language indicates "not merely legislative acquiescence, but affirmative approval of what was, even in 1979, a *longstanding practice* of limiting deductions for differences in circumstances of sale to direct expenses." [6] *Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.,* 753 F.2d 1033, 1038 (Fed.Cir.1985) (emphasis added); *see also Sharp Corp.,* 63 F.3d at 1094; *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 400 (Fed.Cir. 1994) (reaffirming *Consumer Products'* holding that circumstances-of-sale adjustments shall only be made for direct expenses). Direct expenses are "expenses which vary with the quantity sold," while indirect expenses "are those that do not vary with the quantity sold." *Koyo Seiko,* 36 F.3d at 1569 n. 4; *see also Torrington Co.,* 44 F.3d at 1579; *Consumer Prods.,* 753 F.2d at 1035.

Because Commerce found that warranty terms in the home market differ from those offered in the United States, and that such differences wholly or partly account for the differences between the United States prices and foreign market values of the televisions,

---

**6.** Commerce's regulations allow indirect expenses to be deducted from foreign market value if the United States price is based on the exporter's sales price. 19 C.F.R. § 353.15(c) (1985)

(currently codified at 19 C.F.R. § 353.56(b)(2) (1995)); *see also Torrington Co.,* 68 F.3d at 1353. Such an adjustment is denoted an "ESP offset" and is not at issue here.

it was required to make "due allowance therefor." Neither the statute nor the legislative history, however, told it how to determine what allowance is "due." Congress has left that to Commerce's "broad discretion," guided by the limitation that circumstances-of-sale adjustments be made only for direct expenses. *See Smith–Corona*, 713 F.2d at 1576. Consequently, we examine the reasonableness of its interpretation and application of section 1677b(a)(4)(B).

### B.

An agency's interpretation of a statute is entitled to deference where neither its express language nor the legislative history tells how Congress intended an issue to be decided. *See Ad Hoc Comm.*, 13 F.3d at 402 ("Under *Chevron*, . . . courts do not consider the reasonableness of an agency's interpretation of a statute unless the relevant statute is silent or ambiguous on the question at hand."); *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 667 (Fed.Cir.1992). Hence, we must "defer to [Commerce's] interpretation of its own statute as long as that interpretation is reasonable." *Koyo Seiko*, 36 F.3d at 1573.

■ Under Commerce's interpretation of section 1677b(a)(4)(B), a respondent in an antidumping proceeding must establish that each cost component of a claimed circumstances-of-sale adjustment for differing warranty terms independently qualifies as a directly-related expense. This interpretation is consonant with Congress' intent that circumstances-of-sale adjustments only be permitted if they are directly related to the sales under consideration. It comports further with our understanding of section 1677b(a)(4)(B) as only allowing adjustments for "direct expenses." Indeed, Commerce's practice of limiting such deductions to direct

expenses, of which Congress has approved, is "longstanding," dating back to 1960. *Consumer Prods.*, 753 F.2d at 1037–38.

Moreover, the purpose underlying the Treasury Department's [7] 1960 revision of the antidumping regulations is telling. By limiting adjustments to direct expenses, the government was attempting to curb abuses of the circumstances-of-sale provision enacted just two years earlier. *Id.* at 1038. "Foreign producers had claimed indirect expense deductions under the rubric of 'differences in circumstances of sale' to the point where price disparity routinely disappeared." *Id.* Examples of such abuses include foreign producers "claiming deductions for *salesmen's salaries*, . . . and for any other portions of their general expenses—*salaries*, . . . and so forth—which could be considered part of the sales, as distinguished from the production effort." *Id.* (emphasis added) (quoting Hendrick, *The United States Antidumping Act*, 58 Am.J.of Int'l L. 914, 922–23 (1964)).

■ Commerce's interpretation of section 1677b(a)(4)(B) protects against precisely these types of abuses. When a foreign producer claims an adjustment for a particular circumstance of sale, such as warranties, identified by Commerce as a category for which a reasonable allowance will generally be made,[8] the producer might include therein many disparate expenses that differ in both nature and the manner in which they were incurred. Not all of these expenses necessarily impact the difference between foreign market value and United States price. If Commerce were not permitted to analyze each cost component to determine its effect on such differential, unscrupulous foreign producers would be able to artificially reduce dumping margins by including indirect expenses in claimed adjustments.[9] This is pre-

---

7. Treasury was the administering authority of the antidumping laws at that time.

8. *See* 19 C.F.R. § 353.15(b) (1985).

9. Indeed, while the trial court held, and the CTV companies argue, that Commerce must accept all elements of a respondent's claimed adjustment once it has concluded that the circumstance of sale is a directly-related selling expense, the CTV companies themselves recognized that certain

cost elements would be inappropriately included in such an adjustment. They point out that they did not include any overhead of the warranty departments, such as factory space or the cost of repair machinery, in their claimed adjustments. Under their interpretation, however, had they included such costs, Commerce would be powerless to analyze the relation of those costs to the difference between foreign market value and United States price, or decline to include such costs in adjustments. Thus, their own recogni-

cisely the result that the government sought to avoid in revising its antidumping regulations in 1960. It is also a result against which Congress cautioned in 1979. We conclude that it is eminently reasonable for Commerce to analyze the potentially myriad cost components of a claimed circumstances-of-sale adjustment to determine whether each component is a "direct expense," in determining what allowance is "due" or "reasonable."

We reject the CTV companies' argument that the antidumping regulations, 19 C.F.R. § 353.15, require that Commerce make adjustments for differences in warranty terms and that such adjustments must include all of the costs of such differences to the seller. Section 353.15(a) limits circumstances of sale for which a "reasonable allowance" will be made to circumstances that "bear a direct relation to the sales which are under consideration," or direct expenses. Commerce has identified "warranties" as an "example" of a difference in the circumstances of sale for which a "reasonable allowance" will "generally" be made. *Id.* § 353.15(b). "Reasonable allowance," like "due allowance" in section 1677b(a)(4), is not defined, but in making the adjustment, Commerce "will be guided primarily by the cost of such differences to the seller." *Id.* § 353.15(d).

Commerce does not interpret section 353.15 as prohibiting an examination of the cost components of a claimed circumstances-of-sale adjustment. "In determining the meaning of an unclear regulation, the agency's own interpretation is entitled to deference." *Sharp Corp.*, 63 F.3d at 1095. Indeed, "the administrative interpretation is afforded 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* at 1096 (quoting *INS v. Stanisic*, 395 U.S. 62, 71, 89 S.Ct. 1519, 1526, 23 L.Ed.2d 101 (1969)). Commerce's interpretation is neither.

Section 353.15(b) only identifies "warranties" as an "example" of a circumstance for which an adjustment will "generally" be made. This language is a far cry from an

unqualified mandate that Commerce include all cost components identified by a foreign manufacturer as a warranty expense. Here, Commerce made an adjustment for differences in warranties. The adjustment was simply not agreeable to the CTV companies. In light of its broad discretion, it cannot be said that Commerce's actions are plainly erroneous or inconsistent with this provision.

Nor do we deem the regulation's direction that Commerce be guided primarily by the cost of differences to the seller in calculating the adjustment to be a requirement that Commerce include all cost components. Section 353.15(d) simply "allows [Commerce] to compute allowances for differences in the circumstances of sale on the basis of *cost*," as opposed to the effect of such differences on market value. *See Smith–Corona*, 713 F.2d at 1574. This administrative preference is a matter of practicality, for "cost data ... can be employed without [the] extensive econometric analysis" that would be required to determine the effect of differences in circumstances of sale on market value. *Id.* at 1577 n. 27. Thus, section 353.15(d) permits "cost" to the seller to be a guide to Commerce in quantifying what allowance is "due" or "reasonable." It does not require that Commerce include each cost component designated by the CTV companies as a warranty expense in any adjustment. Thus, we do not find Commerce's interpretation to be in conflict with this provision.

### C.

The final inquiry is whether the court erred in concluding that the CTV companies' in-house warranty labor costs were not "fixed." Commerce has explained that it does not include all cost components that could be grouped under the term "warranties" in circumstances-of-sale adjustments. *See* U.S. Department of Commerce, *Study of Antidumping Methodology and Recommendations for Statutory Change* (1985). Instead, it allows, "as direct selling expenses, the cost of free parts supplied ... in servicing" warranties, as well as other direct ex-

tion that not all costs associated with a circumstance of sale recognized in regulation as bearing a direct relationship to price are appropriate for

inclusion in an adjustment undermines their interpretation of the statute and regulation.

penses such as travel and hotel expenses, and "payments to unrelated firms for performing servicing." *Id.* at 45. On the other hand, it does not include "indirect warranty expenses," such as a "serviceman's wages." *Id.* at 46. Consistent with this practice, Commerce here treated parts and payments to unrelated servicing firms as "direct expenses" for which it made adjustments, and in-house "serviceman's wages" as indirect expenses for which it declined to make adjustment.

Notwithstanding, the CTV companies argue that Commerce was wrong to conclude that their in-house warranty labor expenses were indirect expenses because they vary with the terms of the sales under consideration. That, however, is not dispositive. The test is whether the companies' in-house warranty labor expenses varied with the quantity of televisions sold. The CTV companies rejoin their in-house labor expenses do. The evidence upon which they rely, however, betrays the assertion.

The companies point to a spreadsheet in the record containing AOC's monthly home market warranty expenses for the period of December 1983 to December 1984, divided between salaries and benefits paid to in-house warranty service personnel and several other categories. The spreadsheet also shows the home market sales for that period, and reflects several months in which sales increased, yet the salaries and benefits paid to in-house warranty servicing personnel decreased, and vice versa. The same holds true even assuming it takes a month for the impact of an increase or decrease in sales volume to be reflected in the salaries and benefits paid to in-house warranty service personnel. Thus, while the salaries and benefits did vary, the record does not show that they "varied from month to month in accordance with the quantity of the product sold." Therefore, we accept Commerce's determination that the in-house warranty labor expenses at issue were not direct expenses.

### Conclusion

Accordingly, the judgment of the Court of International Trade is reversed and the case is remanded for recalculation of dumping margins in a manner consistent with this opinion.

### COSTS

All parties shall bear their own costs.

*REVERSED AND REMANDED.*